UNITED STATES of America

v.

**Nicodemo SCARFO a/k/a "The Little Guy," Appellant.**

No. 87–1490.

United States Court of Appeals, Third Circuit.

Argued March 7, 1988.

Decided June 29, 1988.

Rehearing and Rehearing In Banc Decided July 25, 1988.

before this court, but would be before the district court on remand.

Robert F. Simone (argued), Harry Lore, Philadelphia, Pa., for appellant Nicodemo Scarfo.

Thomas H. Lee, II (argued), First Asst. U.S. Atty., Edward S.G. Dennis, Jr., U.S. Atty., William B. Carr, Jr., Asst. U.S. Atty., Acting Chief of Appeals, Thomas J. Eicher, Asst. U.S. Atty., Philadelphia, Pa., for appellee U.S.

Before WEIS, GREENBERG and ALDISERT, Circuit Judges.

## OPINION OF THE COURT

WEIS, Circuit Judge.[*]

Because the prosecution's evidence describing the defendant's organized crime group might have caused anxiety among the jurors, the trial judge withheld their identities before and after voir dire in this extortion case. In these circumstances, we find no abuse of discretion either in adopting that procedure or in explaining it to the jury. We also conclude that other crimes evidence was properly received and that the limiting instructions were appropriate. Accordingly, we will affirm the judgment of conviction.

Defendant Scarfo was convicted of conspiracy and extortion in violation of the Hobbs Act, 18 U.S.C. §§ 2, 1951. He was indicted together with five other persons. Two of his associates pleaded guilty and testified as government witnesses, one was a fugitive, and the charges against two others—Councilman Leland Beloff and his

---

[*] At the time of oral argument on this case, the Honorable Joseph F. Weis, Jr. was an active circuit judge. Since that time, Judge Weis has assumed senior status.

assistant Robert Rego—were severed and tried separately.

The evidence at trial permitted the jury to find that Nicodemo Scarfo is the "boss" of the Philadelphia La Cosa Nostra, the organized crime group operating in eastern Pennsylvania and parts of New Jersey. Codefendant Beloff, a Philadelphia city councilman and close friend of Scarfo, cooperated with the group in its illegal activities by corrupting his government office for personal gain. Codefendant Rego, Beloff's administrative aide, also had long standing links with Scarfo's organization.

Beloff and Rego conspired with the Scarfo organization to extort $1 million from a real estate developer, Rouse & Associates, in exchange for Beloff's politically indispensable cooperation in the Penn's Landing redevelopment project on the Philadelphia waterfront. Negotiations between Beloff and representatives from Rouse & Associates were conducted through co-defendant Nicholas Caramandi, a member of the Scarfo organization who later agreed to testify as a government witness.

After the initial contact by Caramandi, the Rouse firm reported the extortion plan to the FBI, which had already placed an informant within the Scarfo organization. As the trial judge assessed the evidence, the remarkable degree of FBI infiltration into the plot permitted the government "to develop virtually conclusive proof of the extortion scheme."

The critical evidence tying defendant Scarfo into the intrigue rested almost exclusively on the testimony of co-defendants Caramandi and Thomas DelGiorno. DelGiorno testified that as a "capo" in Scarfo's group, he and his underlings carried out activities in accordance with instructions received from Scarfo. Among those under DelGiorno's command was Caramandi.

Pretrial proceedings revealed that plea agreements, which included transactional immunity and post-trial witness relocation, had been arranged with Caramandi and DelGiorno in return for their testimony as government witnesses. Both had been implicated in several murders allegedly committed at Scarfo's behest. Their testimony would show that one prospective witness had been killed in the past, one judge had been murdered, and attempts had been made to bribe other judges. Caramandi and DelGiorno's lives had been threatened, and they would remain under heavy guard during their appearances in court.

In view of these unusual circumstances, the trial judge granted the government's motion to empanel an anonymous jury. During voir dire neither party was permitted to learn the jurors' names, residence addresses, or places of employment. However, the prospective jurors completed an extensive written questionnaire which delved into such topics as the nature of their employment, the general neighborhood in which they lived, their age, reading habits, television viewing preferences, education, experience as jurors in previous criminal cases, membership in various organizations, hobbies, and connections to law enforcement agencies. The judge then personally interrogated the prospective jurors, after which he permitted further questioning by counsel.

Before the trial began, the judge told the jurors that they would be selected on an anonymous basis and sequestered. He informed them that they would hear testimony about organized crime, and that he wanted them to consider the case without any apprehension that they or their families would be endangered. The judge made it clear that, in his lengthy career on the bench, he had not heard of a case where a defendant tried to harm a juror and gave his "personal, strong belief" that there was no basis for such concern in this case.

The judge emphasized that anonymity was intended to protect the interests of both the prosecution and the defense. He explained that the anonymous selection procedure was not to be interpreted as a reflection on the defense, but was being used simply as "a precautionary measure to make sure that both sides get a fair trial." The defendant would want to avoid contact with the jury by someone who, though purporting to represent him, sought instead to jeopardize his defense by making threats in his name.

In the charge to the jury at the conclusion of the trial, the court reiterated that the anonymous selection process had been designed to protect the jurors against the possibility that persons not associated with the proceedings might have tried to "muddy up the waters" or "cause unnecessary worry". Although the judge acknowledged that he had adopted the procedure "to relieve your minds of any anxiety," he repeated his "absolute" belief that "there was never the slightest reality to any such feeling of insecurity." The full text of the instructions to the jury is attached to this opinion as an appendix.

Before trial, the defense requested the court to prohibit the United States Attorney from referring to La Cosa Nostra, the mafia, or evidence of murders. The trial judge denied the motion, reasoning that evidence showing that Caramandi and Del-Giorno carried out their instructions to commit other crimes was admissible to establish their subservience to Scarfo.

During the government's case, these two witnesses explained that membership in the Scarfo crime family was limited to only those who had been "made," that is, to those who had committed a murder. They described the secret initiation ceremony in which each proposed member swore absolute loyalty to the crime family.

Caramandi and DelGiorno detailed the various levels of authority within the organization, its murders, briberies, extortions, and other criminal activities, together with the violence that was used to maintain internal discipline. Members participated in such activities only with the knowledge and consent of their superiors. In the case of homicides, however, prior approval from the crime boss himself was required. Both Caramandi and DelGiorno testified to several assassinations ordered because the victims broke the organization's rules.

These witnesses described Scarfo's knowledge of the Rouse extortion scheme and the necessity that he approve Carmandi's participation in the plot. In addition, they told of Scarfo's several modifications to the division of the anticipated extortion proceeds between his organization and the other participants.

After the jury found him guilty on two counts, defendant moved for a new trial and an acquittal. In denying the motions, the district court commented that evidence of Scarfo's leadership and the grave consequences for conducting unapproved criminal activities were crucial to understanding his role as a co-conspirator. The testimony linking Scarfo to murders unrelated to the Rouse extortion was necessary to explain why Caramandi and DelGiorno had turned government witnesses, despite the likelihood of death or serious injury for breaking faith with the mob.

Although defendant did not object to the witnesses' detailed recitations of their part in various crimes, the trial judge cautioned the jury that the government's evidence was admitted for only limited purposes and that defendant was not on trial for those other offenses. The judge was convinced that his limiting instructions on the evidence and the anonymous selection procedures were adequate and that "they not only could, but actually did, eliminate the potential for unfair prejudice."

On appeal defendant raises three arguments. First, he contends that the government's evidence of other crimes was conveyed in frightening detail that made it impossible for the jury to analyze the crucial issues dispassionately. Second, he argues that the empaneling of an anonymous jury was improper and heightened unnecessarily the atmosphere of prejudice and fear, thus denying a fair trial. Third, he asserts that the indictment charged a single conspiracy but that the government at trial had proved multiple schemes.

## I. EVIDENCE OF OTHER CRIMES

■ Federal Rule of Evidence 404(b) generally prohibits the admission into evidence of extrinsic acts intended to prove a defendant's propensity for crime or to suggest to the jury unfavorable inferences reflecting on his character. However, evidence that bears on a relevant issue in the case, though possessing the potential to

damage the defendant's cause, is not inadmissible for that reason alone.

As the Supreme Court clarified in *Huddleston v. United States,* —— U.S. ——, ——, 108 S.Ct. 1496, 1500, 99 L.Ed.2d 771 (1988), Federal Rules of Evidence 401 and 402 embody "the broad principle that relevant evidence—evidence that makes the existence of any fact at issue more or less probable—is admissible unless the Rules provide otherwise." Rule 404(b) is one such rule providing otherwise.

Rule 404(b) is a codification of the common law prohibition against the admission of evidence of prior crimes, wrongs, or other acts relevant solely to prove the defendant's "general criminal predisposition to do wrong." P. Rice, *Evidence: Common Law & Federal Rules of Evidence* 136 (1987). We have said that we will "refuse to admit evidence of prior criminal acts which has no purpose except to infer a propensity or disposition to commit crime." *Government of the Virgin Islands v. Toto,* 529 F.2d 278, 283 (3d Cir.1976).

However, if offered for another, proper purpose, the same evidence of other crimes or acts is subject only to the ordinary limitations under Rules 402 and 403. Before admitting evidence of other acts under Rule 404(b), a court therefore must inquire "whether that evidence is probative of a material issue other than character." *Huddleston,* —— U.S. at ——, 108 S.Ct. at 1499.

Recognizing the risk that unduly prejudicial testimony might be introduced under Rule 404(b), the Supreme Court has listed four guidelines for admissibility under the Rule. First, the other crimes evidence must have a proper purpose. Second, the proffered evidence must be relevant. Third, its probative value must outweigh its potential for unfair prejudice. Fourth, the court must charge the jury to consider the other crimes evidence only for the limited purpose for which it is admitted. *Id.* at ——, 108 S.Ct. at 1502.

The drafters contemplated that Rule 404(b) would be construed as a rule of "inclusion" rather than "exclusion". "They intended to emphasize admissibility of 'other crime' evidence." *United States v. Long,* 574 F.2d 761, 766 (3d Cir.), *cert. denied,* 439 U.S. 985, 99 S.Ct. 577, 58 L.Ed. 2d 657 (1978). The possible uses of other crimes evidence listed in the Rule—motive, opportunity, intent, preparation, plan, knowledge, identity, and absence of mistake—are not the only proper ones. *United States v. Simmons,* 679 F.2d 1042, 1050 (3d Cir.1982), *cert. denied,* 462 U.S. 1134, 103 S.Ct. 3117, 77 L.Ed.2d 1370 (1983).

In *Simmons,* evidence of similar criminal activity perpetrated before the period charged in the indictment was admissible to furnish essential background information, to demonstrate a continuing relationship between an unindicted co-conspirator and the defendant, and to assist the jurors in understanding the unindicted co-conspirator's role in the forgery scheme. *Id. See also United States v. O'Leary,* 739 F.2d 135, 136 (3d Cir.1984) (evidence of other crimes admissible to provide background information, establish parties' familiarity with one another, and prove their concert of action), *cert. denied,* 469 U.S. 1107, 105 S.Ct. 782, 83 L.Ed.2d 776 (1985).

In addition to the Rule 404(b) test, evidence of other crimes must also be evaluated against the unfair prejudice standard of Rule 403. A trial judge, therefore, may exclude logically relevant other crimes evidence if its probative value is substantially outweighed by the risk of undue prejudice. *United States v. Cook,* 538 F.2d 1000, 1003 (3d Cir.1976). In making this determination, the trial judge must appraise the genuine need for the challenged evidence and balance that necessity against the risk that the information will influence the jury to convict on improper grounds. *Id. See United States v. Driggs,* 823 F.2d 52, 54 n. 2 (3d Cir.1987).

We have cautioned that "[i]f judicial self-restraint is ever desirable, it is when a Rule 403 analysis of a trial court is reviewed by an appellate tribunal." *Long,* 574 F.2d at 767. Thus, in *United States v. Dansker,* 537 F.2d 40, 58 (3d Cir.1976), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977), we upheld the district judge's discretion in admitting prior crimes evidence

which cast light on the relationship between a witness and the defendants. Because the government's case against the defendants rested on the testimony of unindicted co-conspirators, evidence describing their relationship to the defendants and providing background information to illustrate the witnesses' roles in the scheme was properly admitted. *Cf. United States v. Schwartz*, 790 F.2d 1059, 1062 (3d Cir. 1986) (relevance of other crimes evidence found to be "marginal at best"); *United States v. Hans*, 738 F.2d 88, 95 (3d Cir. 1984) (no genuine need to prove defendant's previous association with a bank robber other than to improperly suggest criminal propensity); *United States v. Herman*, 589 F.2d 1191, 1198 (3d Cir.1978) (other crimes evidence not admissible to show modus operandi because scheme not unique), *cert. denied*, 441 U.S. 913, 99 S.Ct. 2014, 60 L.Ed.2d 386 (1979).

The district judge here commented that evidence of the defendant's participation in various murders would normally be excluded as irrelevant and unduly prejudicial in a trial for a single extortion scheme. However, in view of the unusual circumstances in this case, the judge concluded that such exclusion would be prejudicial to the government.

Caramandi and DelGiorno had extensive criminal backgrounds. The revelation of these histories would necessarily undermine the jury's willingness to believe the witnesses, particularly if the government were barred from full disclosure. The witnesses' unsavory mores were hardly likely to inspire confidence in their truthfulness and, therefore, it was important for the jury to realize that Caramandi and DelGiorno had been granted immunity for the very murders that they asserted Scarfo had ordered. Moreover, Caramandi's belief that he had been threatened by Scarfo and his fear that his daughter's life was in jeopardy were probative of his motives to testify. Similarly, DelGiorno inferred from the conduct of other organization members that he, too, had been marked for death, a realization that prompted him to approach the authorities and arrange for cooperation.

That Scarfo had such tight control over an organization capable of executing those who incurred his displeasure was obviously an essential fact the jury needed to evaluate in considering the extent to which fear swayed the two witnesses. That the witnesses themselves had participated in the slaying of compatriots accused of disloyalty to the crime family tended to give credence to their dread that they were slated for the same fate.

The other crimes history was relevant to the government's case. If accepted by the jury, the testimony was also damaging to defendant. That impact, however, does not require exclusion here where the evidence was essential in the government's effort to establish the credibility of its disreputable, yet indispensable, witnesses. *Cf. United States v. Rivera*, 837 F.2d 906, 911–13 (10th Cir.1988) (other crimes excluded where government failed to identify its purpose).

The trial judge charged the jury: "Mr. Scarfo is not on trial here for any murders, for any gambling or any other kind of illegal activities.... [T]hose kinds of offenses would be dealt with in other tribunals than this.... I think you can understand that it would be utterly improper for you to take them into account in this case in the sense of saying to yourselves: 'Well, maybe he didn't do this extortion; but he did a lot of other stuff. So it doesn't much matter whether they prove this case. I am going to find him guilty anyway.' That obviously would be totally improper."

In instructing on the proper use of other crimes evidence, the judge explained that the testimony could be used to assess the nature of the relationship among Caramandi, DelGiorno, and defendant.

"It is a position of the Government that Caramandi and DelGiorno were subordinates within this carefully organized and structured organization; that they did Mr. Scarfo's bidding; [that] they never would dream of doing anything this large without his approval; and that the tapes and other evidence in the case corroborate their testimony to the effect that he was involved and did approve."

The judge also told the jurors that they could use the evidence to decide whether defendant adopted a standardized scheme or mode of operation, to determine whether he had knowledge of or an intent to participate in the conspiracy, as well as to evaluate the witnesses' motives for cooperating with the government. Finally, the judge stated that the government had the right to reveal the witnesses' unsavory criminal records "so as not to be accused of trying to hoodwink the jury by pretending that people like Caramandi and DelGiorno were Boy Scouts."

These clear, frank, and comprehensive instructions did all that was possible under the circumstances to place the other crimes evidence in proper perspective. In view of these limiting instructions and our review of this evidence's unique relevancy here, we conclude that the district court did not abuse its broad discretion in permitting the introduction of this testimony.

## II. THE ANONYMOUS JURY

The objections to the selection of jurors without disclosure of their names or addresses fall into two categories: one, an impairment of the right to exercise peremptory challenges; and, two, an infringement on the presumption of innocence.

### A.

Although not guaranteed by the Constitution, the right to exercise peremptory challenges occupies an important position in our trial procedures. *Batson v. Kentucky,* 476 U.S. 79, 91, 98, 106 S.Ct. 1712, 1720, 1723, 90 L.Ed.2d 69 (1986); *Stilson v. United States,* 250 U.S. 583, 586, 40 S.Ct. 28, 29, 63 L.Ed. 1154 (1919); *Pointer v. United States,* 151 U.S. 396, 408, 14 S.Ct. 410, 414, 38 L.Ed. 208 (1894). This venerable practice has long served a core function in the selection of impartial juries. *Batson,* 476 U.S. at 89 n. 12, 106 S.Ct. at 1718 n. 12.

In *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965) (overruled in part by *Batson* ), the Court reviewed the long history of the peremptory challenge, tracing its lineage to early English practice which permitted thirty-five challenges without cause by a criminal defendant and an unlimited number of such challenges by the prosecutor. *Id.* at 212–213, 85 S.Ct. at 831–32. In this country, Congress first allotted peremptory challenges in 1790. The number allotted to each party has been adjusted from time to time until the current schedule was set in Federal Rule of Criminal Procedure 24(b).

Although approving the practice of challenges without cause, the Court in *Swain* noted the criticism leveled against the procedure because of delay, expense, and the elimination of qualified veniremen. *Id.* at 216 & n. 19, 85 S.Ct. at 833 & n. 19. The extensive, protracted, and nearly unlimited voir dire permitted in some state courts has been subjected to particular attack. *See id.* at 216–17 n. 19, 85 S.Ct. at 814 n. 19. In many instances, the voir dire may last longer than the trial itself and, rather than ensuring the selection of an impartial jury, may produce a biased one. In *Batson,* Justice Marshall interjected a further criticism of the practice, stating that "the racial discrimination that peremptories inject into the jury-selection process" could be cured only by "eliminating peremptory challenges entirely." *Id.* 476 U.S. at 102–03, 106 S.Ct. at 1726. *See* P. Devlin, *Trial By Jury* 32–34 (1956); V. Hans & N. Vidmar, *Judging the Jury* 63–94 (1986).

Because voir dire is not of constitutional dimension, limitations affecting peremptory challenges need not be reviewed with the close scrutiny reserved for encroachments on the fundamental rights of an accused.

In a series of decisions, the Court of Appeals for the Second Circuit upheld the selection of an anonymous jury—one in which the jurors are not required to give their names but are identified only by number. In *United States v. Barnes,* 604 F.2d 121 (2d Cir.1979), *cert. denied,* 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980), the trial court presided over the prosecution of a notorious narcotics distribution ring. Recounting the sordid history of attempts at witness intimidation and jury tampering in previous cases of that nature,

the trial judge barred disclosure of the veniremen's names, addresses, ethnic backgrounds, and religion. *See also United States v. Ruggiero,* 846 F.2d 117, (2d Cir. 1988). He conducted extensive questioning on other matters, including a prospective juror' county of residence, occupation, education, membership in groups or clubs, and their possible racial prejudice. The judge explained to the jurors that empaneling them anonymously was intended to insulate them from media harassment. *Id.* 604 F.2d at 137.

The Court of Appeals, noting the broad discretion granted a trial court in conducting voir dire, reviewed a number of decisions in which questioning of jurors had been limited or prohibited entirely on such issues as specific addresses, views on obscenities, attitudes toward drug use, and political viewpoints. *Id.* at 139–40. The court rejected the defendant's contention that jurors must "declare their identities and publicly take responsibility for the decisions they are to make." *Id.* at 140. Instead, the court affirmed the seating of an anonymous jury, reasoning that the procedure allayed the jurors' fears of retaliation against themselves and their families and so promoted impartial decision making.

The *Barnes* precedent was followed in *United States v. Persico,* 832 F.2d 705 (2d Cir.1987), *cert. denied,* — U.S. ——, 108 S.Ct. 1995, 100 L.Ed.2d 227 (1988); *Hayden v. United States,* 814 F.2d 888 (2d Cir. 1987); *United States v. Ferguson,* 758 F.2d 843 (2d Cir.), *cert. denied,* 474 U.S. 1032, 106 S.Ct. 592, 88 L.Ed.2d 572 (1985); *United States v. Thomas,* 757 F.2d 1359 (2d Cir.), *cert. denied,* 474 U.S. 819, 106 S.Ct. 66, 67, 88 L.Ed.2d 54 (1985); and *United States v. Rosado,* 728 F.2d 89 (2d Cir.1984). *Cf. In re Baltimore Sun Co.,* 841 F.2d 74, 76 & n. 5 (4th Cir.1988). The practice of limiting identification of jurors, however, did not originate with *Barnes.* In *Johnson v. United States,* 270 F.2d 721, 724 (9th Cir.1959), *cert. denied,* 362 U.S. 937, 80 S.Ct. 759, 4 L.Ed.2d 751 (1960), the court ruled that the exact address of the jurors could be withheld. *See also Wagner v. United States,* 264 F.2d 524, 527 (9th Cir.),

*cert. denied,* 360 U.S. 936, 79 S.Ct. 1459, 3 L.Ed.2d 1548 (1959).

The *Barnes* case and its progeny have been the subject of law review commentary. *See e.g.,* Note, *Anonymous Juries,* 54 Fordham L. Rev. 981 (1986); Case Comment, *Voir Dire Limitations As a Means of Protecting Jurors' Safety and Privacy,* 93 Harv.L.Rev. 782 (1980); Note, *The Peremptory Challenge in a Criminal Case After United States v. Barnes,* 71 J.Crim.L. & Criminology 173 (1980); Comment, *Defendants Are Not Deprived of the Intelligent Use of Peremptories by Voir Dire Restrictions Intended to Protect Potential Jurors' Safety and Privacy,* 55 Notre Dame Law. 281 (1979).

The Supreme Court touched tangentially on the point in *Press–Enterprise Co. v. Superior Court,* 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984). There, the Court vacated a district judge's decision to both close voir dire to the public and withhold the transcript. The Court recognized that the sensitive facts in the case, involving the rape and murder of a teenage girl, might intrude on the veniremen's privacy. The Court cautioned that this interest must be balanced against the historic need for openness in every phase of the trial process. Yet, the Court suggested that "a valid privacy right may rise to a level that part of the transcript should be sealed, or the name of a juror withheld, to protect the person from embarrassment." *Id.* at 512, 104 S.Ct. at 825.

Although the issue is one of first impression within this circuit, the case law in other forums is helpful. The legal standards articulated by those courts and our review of the record here convinces us that defendant was not deprived of information reasonably necessary to the intelligent exercise of his peremptory challenges. The written questionnaire submitted to the panel encompassed a broad range of personal demographics. Additionally, the individual voir dire conducted by the judge and later by counsel was thorough. There is ample support for the district court's conclusion that "counsel were in a much better position to assess the suitability of prospective

jurors in this case than in most other trials, criminal or civil."

Nor do we quarrel with the court's decision to invoke this unusual procedure. The judge heard testimony during pretrial proceedings that, if believed by the jurors, might well have caused them to be apprehensive—not only for their own safety but, perhaps more acutely, for the safety of their families. In addition, it was not beyond the range of possibility that persons hostile to defendant might have been inclined to harass the jurors. *See United States v. Borelli*, 336 F.2d 376, 392 (2d Cir.1964), *cert. denied*, 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965). In circumstances similar to those here, we must be particularly deferential to the trial judge, familiar as he is with the local ambience. *See Rosales–Lopez v. United States*, 451 U.S. 182, 189, 101 S.Ct. 1629, 1634, 68 L.Ed.2d 22 (1981) (trial judge accorded broad discretion in determining best method for conducting voir dire). *See also Thomas*, 757 F.2d at 1365 (anonymous jury appropriate where judge believes jurors need protection and where precautions to minimize effect are taken).

Juror's fears of retaliation from criminal defendants are not hypothetical; such apprehension has been documented. *See, e.g., United States v. Grandison*, 783 F.2d 1152, 1155 (4th Cir.), *cert. denied*, 479 U.S. 845, 107 S.Ct. 160, 93 L.Ed.2d 99 (1986); *United States v. Thomas*, 632 F.2d 837, 841 (10th Cir.), *cert. denied*, 449 U.S. 960, 101 S.Ct. 373, 66 L.Ed.2d 227 (1980); *Owens v. Estelle*, 484 F.Supp. 230, 233 (W.D. Tex.1979), *aff'd mem.*, 611 F.2d 880 (5th Cir.1980). No doubt similar reactions in unreported cases have occurred. As judges, we are aware that, even in routine criminal cases, veniremen are often uncomfortable with disclosure of their names and addresses to a defendant. The need for such information in preparing an effective defense is not always self-evident. If, in circumstances like those in *Barnes*, jury anonymity promotes impartial decision making, that result is likely to hold equally true in less celebrated cases.

The virtue of the jury system lies in the random summoning from the community of twelve "indifferent" persons—"not appointed till the hour of trial"—to decide a dispute, and in their subsequent, unencumbered return to their normal pursuits. *See* 3 W. Blackstone, *Commentaries* * 378. The lack of continuity in their service tends to insulate jurors from recrimination for their decisions and to prevent the occasional mistake of one panel from being perpetuated in future deliberations. Because the system contemplates that jurors will inconspicuously fade back into the community once their tenure is completed, anonymity would seem entirely consistent with, rather than anathema to, the jury concept. In short, we believe that the probable merits of the anonymous jury procedure are worthy, not of a presumption of irregularity, but of disinterested appraisal by the courts.

We are mindful that in capital cases, the law requires the disclosure of the names and addresses of prospective jurors three days before trial. *See* 18 U.S.C. § 3432. We, of course, are not confronted with that situation here, and do not address it in this opinion.

The ruling of the district judge to limit voir dire is supported by respectable legal authority and grounded in legitimate concerns for juror safety. We find no abuse of the judge's substantial discretion in taking that measure here.

## B.

█ The defendant, although dissatisfied with the anonymous jury procedure itself, concentrates his strongest fire on the trial judge's explanation to the jurors of the reasons for his action. He asserts that the court's statements caused an impermissible infringement on the presumption of innocence.

The presumption of innocence has been hailed as "undoubted law, axiomatic and elementary," the enforcement of which "lies at the foundation of the administration of our criminal law." *Coffin v. United States*, 156 U.S. 432, 453, 15 S.Ct. 394, 402, 39 L.Ed. 481 (1895). Yet, it is a doctrine widely misunderstood and often cited

erroneously in contexts far removed from the trial itself.

The presumption of innocence allocates to the government in criminal trials the burden to persuade a jury of the defendant's guilt beyond a reasonable doubt. *Taylor v. Kentucky,* 436 U.S. 478, 483–85 & n. 12, 98 S.Ct. 1930, 1933–34 & n. 12, 56 L.Ed.2d 468 (1978); *Hampton v. Holmesburg Prison Officials,* 546 F.2d 1077, 1080 n. 1 (3d Cir.1976). It acts as an admonition to the jury to determine an accused's guilt or innocence exclusively on proper evidence admitted at trial, and not by inference from any suspicions that may arise from the defendant's arrest, indictment, custody, or other events not introduced into the record. *Bell v. Wolfish,* 441 U.S. 520, 533, 99 S.Ct. 1861, 1870, 60 L.Ed.2d 447 (1979); *Taylor,* 436 U.S. at 485, 98 S.Ct. at 1934.

The presumption of innocence is "an inaccurate, shorthand description of the right of the accused to 'remain inactive and secure, until the prosecution has taken up its burden and produced evidence and effective persuasion.'" *Bell,* 441 U.S. at 533, 99 S.Ct. at 1871. It technically is not a "presumption"—an obligatory inference drawn from a fact admitted into evidence. "Instead, it is better characterized as an 'assumption' that is indulged in the absence of contrary evidence." *Taylor,* 436 U.S. at 484 n. 12, 98 S.Ct. at 1934 n. 12. The misnomer persists because the courts find the phrase useful in impressing upon the jury at trial the importance of the defendant's right to be *proved* guilty. *Id.* at 485, 98 S.Ct. at 1934.

The doctrine has been documented from origins in Deuteronomy, through adoption in the Roman Code, to emergence in the English and American common law. *Coffin,* 156 U.S. at 454–56, 15 S.Ct. at 403. The presumption becomes an important consideration when events during trial create the risk that a juror might decide the case on a basis extraneous from the evidence produced in court. In *Estelle v. Williams,* 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976), for example, the Court disapproved the practice of compelling defendants to appear at trial in identifiable prison uniforms. The practice furthered no essential state policy and presented an "unacceptable risk" of "impermissible factors coming into play" to unconstitutionally influence the jury's deliberations. *Id.* at 505, 96 S.Ct. at 1693.

The Court, however, has not ignored the harsh realities of criminal trials. In *Holbrook v. Flynn,* 475 U.S. 560, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986), the Court decided that the presence of armed, uniformed state troopers in the courtroom was not an infringement on the presumption of innocence. "Recognizing that jurors are quite aware that the defendant appearing before them did not arrive there by choice or happenstance, we have never tried, and could never hope, to eliminate from trial procedures every reminder that the State has chosen to marshal its resources against a defendant to punish him for allegedly criminal conduct." *Id.* at 567, 106 S.Ct. at 1345. More dramatically, in *Illinois v. Allen,* 397 U.S. 337, 344, 90 S.Ct. 1057, 1061, 25 L.Ed.2d 353 (1970), the Court conceded that in certain extreme circumstances shackling and gagging may be "the fairest and most reasonable way to handle" a particularly disruptive defendant.

The courts of appeals have recognized that trial judges must have wide discretion in maintaining courtroom security and in protecting their processes from outside interference. *See, e.g., United States v. Garcia,* 625 F.2d 162, 167 (7th Cir.), *cert. denied,* 449 U.S. 923, 101 S.Ct. 325, 66 L.Ed.2d 152 (1980); *United States v. Clardy,* 540 F.2d 439, 443 (9th Cir.), *cert. denied,* 429 U.S. 963, 97 S.Ct. 391, 50 L.Ed.2d 331 (1976); *Chicago Council of Lawyers v. Bauer,* 522 F.2d 242, 248 (7th Cir.1975), *cert. denied,* 427 U.S. 912, 96 S.Ct. 3201, 49 L.Ed.2d 1204 (1976).

The courts have permitted inmate witnesses to be bound in handcuffs and leg irons where precautions are taken to shield these security measures from the jury's view. *United States v. Amaro,* 816 F.2d 284, 285 (7th Cir.1987); *Wilson v. McCarthy,* 770 F.2d 1482, 1484–85 (9th Cir.1985). The use of metal detectors positioned directly outside the doors of the courtroom in

which the defendant is being tried have been approved. *United States v. Carter,* 815 F.2d 1230, 1231–32 (8th Cir.1987); *United States v. Kelly,* 551 F.2d 760, 766 (8th Cir.), *cert. denied,* 433 U.S. 912, 97 S.Ct. 2981, 53 L.Ed.2d 1097 (1977); *United States v. Heck,* 499 F.2d 778, 788 (9th Cir.), *cert. denied,* 419 U.S. 1088, 95 S.Ct. 677, 42 L.Ed.2d 680 (1974). The sequestration of the jury at a naval station has also been upheld. *United States v. Hoffa,* 367 F.2d 698, 711–12 (7th Cir.1966), *vacated on other grounds,* 387 U.S. 231, 87 S.Ct. 1583, 18 L.Ed.2d 738 (1967).

The Court of Appeals for the Second Circuit in *Thomas* distinguished the anonymous jury question from the jail garb case by reasoning that, unlike requiring inmates to appear in prison clothing, "protection of jurors is vital to the functioning of the criminal justice system." *Thomas,* 757 F.2d at 1364. The court wrote: "As a practical matter, we cannot expect jurors to 'take their chances' on what might happen to them as a result of a guilty verdict.... Justice requires that when a serious threat reasonably is found to exist, precautionary measures must be taken." *Id.*

In three of the Second Circuit cases we cited above, the trial judges discussed with the jurors the likelihood that their case might receive considerable publicity, explaining that anonymity was being provided to protect them from unwanted media inquiries. *See Ferguson,* 758 F.2d at 854; *Thomas,* 757 F.2d at 1364–65; *Barnes,* 604 F.2d at 137. The process thus was presented as an attempt to ward off those who might otherwise infringe on the jurors' privacy and to shelter them from undesired publicity.

In this case, the trial judge rejected that explanation as improper. He stated that the purported justification was a subterfuge which concealed the actual reason for preserving anonymity. "In my view, judges must deal honestly with juries, or the entire system will break down." However, "the full and truthful explanation of the reasons for juror anonymity should not cast any adverse reflection upon the defendant beyond that which inevitably, and

properly, occurs if the jury accepts as true the government's evidence at trial." As the judge candidly acknowledged, the jury might assume that he had formed some opinion as to the guilt of defendant unless this impermissible assumption was eliminated or greatly minimized by appropriate instructions from the bench. *Cf. Rosado,* 728 F.2d at 94–95.

The same observations also apply to other courtroom security procedures. The presence of armed guards in the courtrooms, the placement of metal detectors just outside the doors, and the sequestering of the factfinders at a secret location inevitably must convey the idea that the trial is something more than a mere academic dispute between lawyers. Doubtless the jurors are aware that the trial judge exercises control over security matters and has approved, if not actually directed, their implementation. Yet we need not labor through an extended discussion to prove that such precautions have not deterred jurors in the past from acquitting defendants when the evidence did not support conviction.

Essentially, trials in criminal cases depend on the intellectual integrity and common sense of those chosen to decide whether the prosecution has met its burden. The constitutional guarantee of trial by jury is premised on the fundamental belief that juries will follow the law, that they will not convict on mere suspicion but will instead require proof beyond a reasonable doubt. *See Richardson v. Marsh,* ⸺ U.S. ⸺, ⸺, 107 S.Ct. 1702, 1706–07, 95 L.Ed.2d 176 (1987). The citizens of this country have placed their faith in the jury system and the courts are obliged to honor that tradition. *See Duncan v. Louisiana,* 391 U.S. 145, 152–54, 88 S.Ct. 1444, 1449–50, 20 L.Ed.2d 491 (1968).

Viewed from this perspective, the trial judge here was correct in his decision to be frank with the jury. It is a mistake to assume that jurors are naive and unfamiliar with the realities of life. The jury is designed to represent a broad, cross-section of the community, selected from among the defendant's peers. *Taylor v. Louisiana,*

419 U.S. 522, 527, 95 S.Ct. 692, 696, 42 L.Ed.2d 690 (1975); *Smith v. Texas,* 311 U.S. 128, 130, 61 S.Ct. 164, 165, 85 L.Ed. 84 (1940); *Strauder v. West Virginia,* 100 U.S. (10 Otto) 303, 308, 25 L.Ed. 664 (1879). The very fact that jurors are well acquainted with life in their community is perhaps the most significant reason why faith in the system has continued. *See Apodaca v. Oregon,* 406 U.S. 404, 410, 92 S.Ct. 1628, 1632, 32 L.Ed.2d 184 (1972) (essential feature of jury trial lies in interposing common sense judgment of laymen between accused and accuser).

Nevertheless, it is interesting to speculate that if the judge had not made a point of discussing anonymity, the jurors might have simply assumed that to be the normal procedure. Those who never before served on a jury could have concluded that identification by number was standard in all criminal cases. The anonymity feature, therefore, is not intrinsically suggestive of any inference of guilt. That is not to say that it would have been appropriate to withhold an explanation here where some of the prospective jurors may well have served on other occasions.

Even assuming that the jurors were influenced by the court's decision to empanel anonymously, the defense's assumption that anti-defendant bias is the only possible, or even the most likely, reaction is suspect. Predicting juror responses to the anonymity practice is pure speculation.[1] A juror who fears a defendant's retaliation might be more apt to return a guilty verdict despite such fears rather than because of them. *See Owens,* 484 F.Supp. at 233. If, however, anonymity dispels apprehension, it serves the ideal of dispassionate judgment.

It is worth observing, too, that after jury selection is concluded, the anonymous selection feature provides no reinforcing reminders of improper or unfavorable inferences. Unlike such continuing security

precautions as armed guards and metal detectors, voir dire, once completed, is not repeated.

We have carefully reviewed the instructions given by the trial judge and are persuaded that they were proper in adequately protecting defendant from possible adverse juror inferences.

In sum, we reject the defendant's challenge to the jury selection process employed in this case.

### III.

As a final point, defendant contends that there was a variance between the single conspiracy charged in the indictment and what he asserts were multiple conspiracies proved at trial. We find no merit in this contention.

The judgment of the district court will be affirmed.

### APPENDIX

At the start of the trial, before the opening speeches of counsel, the court gave the following instructions to the jury:

"Now, there are certain additional comments concerning the manner in which you have been selected and the manner in which you are going to be treated throughout this trial. You understand that you will be sequestered. This is not at all unusual. In any case involving a high degree of publicity or a case which is expected to attract a high degree of publicity, we like to keep jurors to themselves and to see to it they do not hear anything on the radio or television about the case. We want and both sides want to make sure when the time comes your verdict is based upon what you hear in the courtroom and not on what somebody may have said in the newspapers.

*United States v. Borelli,* 336 F.2d 376, 392 (2d Cir.1964), *cert. denied,* 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965). Several of the jurors interpreted the notes as clever attempts to *discourage* convictions, a meaning precisely opposite to the words the author wrote. *Id.*

---

**1.** Seven jurors in one criminal trial received unsigned letters which read:

"Find these guinea sons of bitches guilty. Don't let them get away with something they did a long time ago. Send them to jail now, all those Mafia bums."

"This case is a little different from most in that, as you know, you have been selected on an anonymous basis. This is a sort of experimental procedure that we are trying in this case; and the reasons for it, I want to make clear, do not have anything to do with the guilt or innocence of the defendant, but rather that question of his guilty or innocence is something which you as jurors will decide on the basis of the evidence which has been presented.

"As in all cases, the judge has to try to provide a fair trial to both sides; and I have to touch all bases. If this were a civil case where the plaintiff was suing the defendant for damages, I would be required to instruct the jury on how they calculate damages even though I don't know whether they are going to decide in favor of the plaintiff or not. So that I have to take into account all possibilities, and that applies also in deciding how the case should be run.

"I am aware, from what has been stated by government counsel in its pleadings and pretrial presentations and so forth, of the general nature of the evidence which the government will present. It is not up to me to decide—and I have not decided and I express no opinion—as to whether that evidence is true or not true. That is the issue which you as jurors will be required to decide.

"But it is conceivable that you will decide that the government's evidence is correct. And if so, then the nature of that evidence is such that you might be apprehensive of the possibility of repercussions or anything of that sort, and that somebody might try to interfere with your performance as a juror, or that they might try to interfere with your family, or you might be apprehensive that they would.

"There will be a lot of testimony—whether you accept it or not is up to you—but there will be a lot of testimony concerning organized crime and the activities of people in organized crime. We want to make sure that you are able to reach your verdict in this case without having to concern yourselves about the possibility of any harm or other improper influence on yourself or members of your family.

"I want to emphasize very strongly that this in no way suggests that the defendant would ever have dreamed of interfering with you or your family. I have been a judge now for 27 years, and in all that time I have never heard of a case where any defendant ever tried to cause harm to a juror or a member of the juror's family. But we all watch television. We all read newspapers. We see the Godfather movies. We know the atmosphere which is sometimes portrayed on television and in movies and newspapers. And I wanted to make sure that no member of the jury would worry about it, even though it is my personal, strong belief that there would never have been any basis for any worry or concern even if you accept the government's evidence as correct. And, as I say, that is something which is up to you and not something which I have decided.

"And from the defendant's standpoint, he does not want to be in a position where somebody, in order to cause him harm, might pretend to be representing him and causing threats to the jury. Similarly, he does not want to be exposed to the possibility that some unscrupulous government agent or somebody who thinks they are helping the government might try to create some impression on the part of the jury that the defendant is bringing pressure on them.

"In any high-profile case, we are all subject to crank phone calls and anonymous letters and that sort of thing. We want to protect the defendant as well as the government from any belief on the part of the jury that these communications are coming from the other side. In other words, we don't want the defendant to be characterized as somebody who would be sending anonymous communications to the jury; and we don't want the government to be characterized as somebody who is trying to influence the jury improperly.

"To make a long story short, this is done in order to provide laboratory conditions so that both sides will get a fair trial. It is most emphatically not being done because

of any apprehension on the part of the court that you would have been endangered or subject to improper pressures if your names had been disclosed. Your names have not been disclosed to either side, and that is the way we are going to keep it, just to be sure that there is no suggestion on anybody's part of anything improper from either side. Now, having said that—and I may dwell on it a little more fully in the course of the closing comments—but I want to make sure that you understand the fact that you are anonymously selected and are being sequestered is not in any way a reflection upon the defendant or the defense or anybody associated with the defense. It is simply a precautionary measure to make sure that both sides get a fair trial."

The court's charge at the conclusion of the trial included the following:

"I just want to make sure you understand that nothing having to do with your being sequestered has any bearing on the case so far as your verdict in choosing which of the competing arguments to accept.

"The reason that you have been kept anonymous, as I stated earlier, is simply because in view of the nature of some of the evidence and of the witnesses who would be testifying, we wanted to make sure that you would not have any apprehensions about your safety or the safety of your families or anything else. I repeat what I said earlier, that I can assure you absolutely that there was never the slightest reality to any such feeling of insecurity. In other words, there was never any consideration by this court in deciding that you should be anonymous, that any of the parties to this action would have done anything or caused you any problems.

"We simply wanted to protect you against the possibility that others not associated with the trial might have tried to muddy up the waters, might have tried to cause unnecessary worry, and primarily because we wanted to relieve your minds of any anxiety, even though so far as I am concerned, there would never have been any cause for any genuine anxiety. We wanted to be sure that you would be able to act absolutely free of any such worries.

"And as I told you at the beginning, and I will repeat now, the fact that you have been sequestered and have been kept anonymous does not represent any expression of opinion on the part of the court as to the validity or accuracy of any of the testimony which has been presented. This does not represent a decision that in fact these witnesses for the government are telling the truth, nor, of course, does it state a contrary position. It is simply a totally neutral decision so far as you are concerned."

