**UNITED STATES of America**

**v.**

**Joseph M. McDADE.**

**Criminal No. 92–249.**

United States District Court,
E.D. Pennsylvania.

June 10, 1996.

Michael R. Stiles, U.S. Attorney, Valli Baldassano, Thomas J. Eicher, Nicholas Harbist, Suzanne Ercole, Asst. U.S. Attys., U.S. Attorney's Office, Philadelphia, PA, for Government.

Salvatore Cognetti, Foley, Cognetti & Cowley, Scranton, PA, John E. Riley, Vaira Backstrom & Riley, Philadelphia, PA, G. Robert Blakey, Notre Dame, IN, for defendant.

## MEMORANDUM

GAWTHROP, District Judge.

Before the court is a list of 106 proposed voir dire questions which both sides have asked that I submit to the prospective jurors in this case, a case involving a United States Congressman charged with various counts of bribery, illegal gratuities, and racketeering, among others. Since several of the questions give me some concern, and since issues regarding those questions are capable of repetition, yet often evade review, and even formal, written adjudication, of alleged propriety, I deem it appropriate to take a few minutes to memorialize some thoughts. For reasons of time, and recognition of the doctrine of diminishing marginal returns, I shall not opine on all 106, but shall focus on a handful of the more vexing.

■ After asking for the prospective juror's number and name in this non-anonymous[1] inquiry, the document reads: "Your Sex: Male ____ Female ____". Without delving into a discussion of whether that information may be gleaned from circumstantial evidence, one observes that the focus of the inquiry has been proclaimed an impermissible, unconstitutional basis for removing a juror.[2] That being so, I see no proper

---

1. In *United States v. Scarfo*, 850 F.2d 1015, 1023 (3d Cir.), *cert. den'd*, 488 U.S. 910, 109 S.Ct. 263, 102 L.Ed.2d 251 (1988), the Third Circuit Court of Appeals sanctioned the use of anonymous juries, particularly where persons hostile to the jurors' service could subject them or their families to harassment or even violence. The Supreme Court of the United States, however, has yet to speak on the issue.

2. *J.E.B. v. Alabama*, 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994).

purpose in the question and hence shall not permit it.

■ Question 4 reads: "Do you have any difficulty reading or understanding the English language?" This case involves a number of documents written in English, which the jury will be called upon to review. So also, the testimony, summations, and charge will be in English. Further, it is important that each juror be able to communicate verbally with the other jurors during deliberations. That stage of the trial should be a collective search for the truth not by some, but by all twelve. To have one or more of them linguistically cordoned off from the debate would tend to cause some unacceptable attrition in the right to trial by jury, proclaimed in Article III, Section 2, as well as the Sixth Amendment, of the United States Constitution. I thus deem the question relevant and proper.[3] It might be a more meaningful inquiry if it were translated at least into Spanish, which it shall be. The Spanish translation reads: "¿Tiene Ud. alguna dificultad en leer y en entender el Inglés?"

■ Questions 6 through 9 ask: "What is the general condition of your health?—If you have a health problem, please state briefly the nature of the problem"; "What is the general condition of your eyesight?—Do you wear contact lenses or glasses?"; "What is the general condition of your hearing?—Do you wear a hearing aid?"; "Do you require regular or frequent medication or medical care and attention?—If you require regular or frequent medication, please describe the nature of the medication, its effect upon you, and the frequency of taking such medication".

These questions are far too broad. I recognize that in this information era, matters of personal privacy have been largely eclipsed, or at the very least, placed within something of a penumbra. And I recognize as well that when it comes to prying into matters personal to a juror, the interests of counsel on either side of the aisle are not necessarily antagonistic. All the lawyers want to learn just about all they can about all the prospective jurors. Thus, the court is confronted with no objections that require a ruling; and a trial judge is well aware that, absent any Sixth Amendment ineffectiveness, no ruling means no opportunity for reversible error. The easy, irreversible course is to say and do nothing, and let the lawyers do their thing. Just as the lawyers have a right to learn something about the prospective jurors, the jurors, who find themselves suddenly beckoned by quirk of the computer and other concatenations of coincidence, to sit on an important trial, a trial which our Constitution commands be held in public, soup to nuts, voir dire [4] to verdict, have a right not to be unduly stripped of their personal privacy before, theoretically, the world.

The general condition of one's health is a singularly invasive topic. Many maladies are very personal, the public proclamation of which could well cause the sick juror considerable, understandable consternation. Similarly, the medications one is regularly taking are matters private to a juror, pharmacist, and physician. Just because one gets called into jury service does not give eager and assiduous counsel the right to, in effect, rummage through one's medicine cabinet, with press and public, their curiosity piqued, figuratively peering over counsel's shoulders, perusing the array of Rx labels. It indeed might be interesting and useful for lawyers to get to know each juror's personal pharmacopeia, giving them telling insights into his or her body chemistry. But there must be some balance. It must never be forgotten: jurors have rights too.

■ Their privacy rights—"to be let alone" [5]—are not, of course, absolute. Their jury service does expose them to some

---

**3.** For example, 28 U.S.C. § 1865 (1994) provides that any person is qualified to serve on grand or petit juries in district court unless he:
  (2) is unable to read, write, and understand the English language with a degree of proficiency sufficient to fill out satisfactorily the juror qualification form;
  (3) is unable to speak the English language.

**4.** In *Press–Enterprise Co. v. Superior Court*, 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984), the Supreme Court held that the constitutional guarantee of open public proceedings in criminal trials extends to voir dire. I construe this holding as encompassing all voir dire questioning—both oral and written.

**5.** *Olmstead v. United States*, 277 U.S. 438, 478, 48 S.Ct. 564, 572, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting).

searching inquiry as to such matters as their ability to be fair, their absence of preconceived, fixed opinions. But there must be some balance, some drawing the line, and when hard-charging counsel are in hot pursuit of every little empirical nugget they get their eyes on, it is the trial judge who must, *sua sponte*, reign them in and give the jurors some protection.[6] Thus, I shall permit inquiry as to whether the jurors have any difficulty hearing or seeing, so that they could not aurally and visually [7] assimilate the evidence as it comes forth,[8] and whether they take medication or have medical problems which might prohibit their sitting full days, full weeks, through a trial which might possibly go for two months. The remainder of the medical/pharmaceutical inquiry I shall preclude.

■ Question 24 reads: "Your annual income? If your spouse is employed, please include his/her income".

| Yours | | Your Spouse |
|---|---|---|
| _____ | Less than $10,000 | _____ |
| _____ | $10,000 to $49,999 | _____ |
| _____ | $50,000 to $99,999 | _____ |
| _____ | $100,000 to $149,999 | _____ |
| _____ | $150,000 or more | _____ |

This question I find offensively intrusive. The amount of one's income is personal. Although the salaries of those who work in the public sector or for publicly held companies are often an open book, in plain public view, private income is another matter. Except for the taxing authorities, who are statutorily required to . keep such information under

wraps, what one makes is no one else's business. That a prospective juror should be required to divulge, under penalty of perjury, and at the enthusiastic behest of all the lawyers in this case, the monetary cubbyhole into which his or her income happens to fall, I find to be beyond the pale.[9] A fortiori is that the case for the juror's spouse, who is not even called for jury service, not present to object.

■ Beyond the offensive invasiveness, I cannot say that one gets any greater or lesser quality of justice from a juror according to that juror's economic worth. Having worked regularly with thousands of jurors for over a quarter of a century, I have been repeatedly impressed with the thoughtful synergy that occurs when people from all walks of life coalesce inside the jury room. The quality of justice does not decline because some happen to be rich, some poor. Quite the opposite.

Finally, as with the first question, inquiring of a juror's sex, one may draw certain logical inferences, of course, as to where jurors stand on the economic hierarchy simply by looking at their and their spouses' occupations, information already provided on the jury list.[10] This is quite enough information to sate this inquisitive quest.

Questions 59, 62, 63, 65, 71, 72, and 73 seek all sorts of interesting information. Question 59 reads: "What civic, social, religious, charitable, volunteer, professional or business or-

6. In *Press–Enterprise Co.*, 464 U.S. at 511–12, 104 S.Ct. at 824–25, the Supreme Court recognized that it is the trial judge who must maintain control of the voir dire process and balance the privacy interests of potential jurors against the historical values that favor open proceedings. *See also Brandborg v. Lucas*, 891 F.Supp. 352, 356 (E.D.Tex.1995) ("While the parties have attorneys to champion their rights, the court must protect the privacy rights of the prospective jurors.").

7. Whether they wear contact lenses, for example, is another invasive irrelevance. The question is whether they will be able to perceive the evidence. Whether it need be refracted en route to the retina is none of the lawyers' business.

8. The court is not unmindful of the Americans with Disabilities Act, 42 U.S.C. § 12101, et seq. (1995), and its precursors. But the situation might arise where there is some tension between

the statutory right of a deaf and/or blind juror to sit on a jury, and the constitutional right of a defendant to have his or her rights to trial by jury and due process of law not be unduly disabled.

9. In *United States v. Hirschberg*, 988 F.2d 1509, 1514–15 (7th Cir.), *cert. den'd*, 510 U.S. 918, 114 S.Ct. 311, 126 L.Ed.2d 258 (1993), the Seventh Circuit held that it was not an abuse of discretion for the trial judge to omit a proposed voir dire question about bias against wealthy people, where one of the defendants intended to use his wealth to demonstrate lack of motive.

10. This court's jury list already provides the name, address, age, occupation, employer, marital status, and spouse's occupation of all who are summoned. That information, itself, gives me a substantial head start in sizing up the array.

ganizations do you or your spouse belong to? (a) Do you or your spouse currently hold an office in any of these organizations?; (b) if yes, please indicate the office(s) held and the responsibilities of that office". Questions 62 through 65 ask: "Are you currently reading a book? If yes, what is the title of the book?"; "If you do enjoy reading books, list the kind(s) of books you like to read"; "List any newspapers that you read. Please indicate how frequently you read them"; "List magazines that you read. Please indicate how frequently you read them". Question 71: "How often do you watch the news?"; number 72 asks: "What are your three favorite television shows?"; 73: "Do you watch any of the following programs (check all that apply)?" *60 Minutes, 20/20, Nightline, Dateline, Law & Order, Current Affair;* Other news/business/entertainment shows (specify)."

■ I happen to believe that the United States Department of Justice, and defense counsel, have no business knowing what book a juror is currently reading, presumably within the quiet confines of his or her own home—or wherever, for that matter. Neither may they properly inventory the jurors' bookshelves and magazine racks, nor scrutinize their library cards. Whatever marginal insights trial lawyers and their jury consultants [11] may gain from this information is markedly outweighed by concerns Orwellian. When one comes into court to serve as a juror, one gives up plenty: time, freedom, and the usual right to read, hear, and see the news—to name but a few of the sacrifices. But to be subjected to such inquiries as those here would be to give up more than is necessary for the proper and fair administration of justice.[12] The lawyers may certainly ask

whether jurors have read or heard about the defendant or any lawyer or witness involved in the case, or anything about the case. Should the answer be "yes", they shall be permitted full follow-up questioning with individual voir dire. But whether they watch *Sixty Minutes,* or *Dateline,* or *Nightline,* or *Baywatch,*[13] for that matter, as fascinating as some might find these snippets of information to be, sheds no real light on whether they have formed a fixed opinion as to what the verdict in this yet-untried case would be, or whether they would approach it with even a hint of bias.

■ One other question bears mention, number 74: "Has your opinion of the criminal justice system changed due to the O.J. Simpson trial?" This question I shall allow, but I shall ask it orally. It has been my observation during and since that trial, having spoken with a number of jurors in cases before me after their trials were over, that *California v. Simpson,* No. BA097211 (Ca.Super.Ct.), has had a substantial impact on jurors' minds, on their perception of how trials are supposed to work. I have had them say, for example, that they "thought a lawyer didn't think much about his case, wasn't much of lawyer, because his opening statement was only thirty minutes long." This misapprehension is preposterous, of course, yet understandable, in the view of the way that case was presented.

I comment not at all upon the verdict itself. But as for the way the trial was conducted, suffice it to say that it was something other than a jurisprudential paradigm for the way cases are and should be tried. Since prospective jurors may have been mis-

---

**11.** I am generally led to believe that the so-called "jury selection experts," lately so much in vogue, want to know all this information, finding it invaluable to their endeavors. They seem to think that because they will find it useful, then, Q.E.D., they should have it. My intent in having a fair and impartial jury in this case is total. And I turn not a deaf ear to their entreaties and concerns. But, ultimately, my decision must turn not so much on the latest trends in psychology, but on the present state of the law.

**12.** In *United States v. Phibbs,* 999 F.2d 1053, 1071 (6th Cir.1993), *cert. den'd,* 510 U.S. 1119,

114 S.Ct. 1071, 127 L.Ed.2d 389 (1994), the Sixth Circuit held that the portion of a voir dire questionnaire aimed at discerning the "personal habits and activities of the panels members (e.g., what books they read, what television shows they watch, etc.) ... might have aided defendants in identifying sympathetic jurors, [but] it was not needed to compose a fair-minded jury."

**13.** Assuming, of course, these shows contained nothing about this case, which, I believe, they have not.

led by that example, I deem it a proper subject of inquiry and colloquy.

■ I could go on in voicing my views on counsels' proposed litany of questions, but I shall not. I did, however, want to convey to the parties the sense of the court. My desire to acquire a fair and impartial jury is unalloyed. But to achieve that essential threshold goal, in exercising this trial judge's discretion as to what questions the jurors must answer,[14] I deem it appropriate to engraft something of a Federal Rule of Evidence 403 analysis onto the exercise.[15] There must be some balance between the need, the probative value, in learning about matters prima facie private to the juror, and the unfair prejudice to the juror in sanctioning such prying, as well as the reality that delving into matters which really are, at best, tangential can result in a needless waste of time.

■ One final matter: the juror's right to object. In *Press–Enterprise Co.*, the Supreme Court issued an injunction to all trial judges which is sometimes forgotten and therefore is well worth reiterating today:

> To preserve fairness and at the same time protect legitimate privacy, a trial judge must at all times maintain control of the process of jury selection and should inform the array of prospective jurors, once the general nature of sensitive questions is made known to them, that those individuals believing public questioning will prove damaging because of embarrassment, may properly request an opportunity to present the problem to the judge in camera but with counsel present and on the record.

464 U.S. at 512, 104 S.Ct. at 825. Jurors have a right to know that they have a right to object and to have their privacy concerns treated with appropriate sensitivity.

---

14. "The obligation to impanel an impartial jury lies in the first instance with the trial judge." *Rosales–Lopez v. United States*, 451 U.S. 182, 189, 101 S.Ct. 1629, 1634–35, 68 L.Ed.2d 22 (1981).

15. Rule 403 reads:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.