**UNITED STATES of America**

v.

**Rayful EDMOND, III, et al.**

**Cr. No. 89–0162 (CRR).**

United States District Court,
District of Columbia.

Feb. 5, 1990.

See also, 718 F.Supp. 994.

Jay B. Stephens, U.S. Atty., for the District of Columbia, Betty Ann Soiefer, Robert Andary, Barry M. Tapp & Noel A. Brennan, for the U.S.

Ernest McIntosh, Washington, D.C., for Willie Childress.

Arthur M. Levin, Washington, D.C., for Columbus Daniels.

William Garber, Washington, D.C., for Rachelle Edmond.

Stuart F. Johnson, Washington, D.C., for Robert Hardy.

John Drury, Washington, D.C., for Deatria Lindsay.

Michele Roberts, Washington, D.C., for Patrick McDonald.

Dennis Hart, Washington, D.C., for Ronald Morgan.

Gary Kohlman, Washington, D.C., for Constance Perry.

Sol Rosen, Washington, D.C., for Melvin Stewart.

Retna Pullings, Washington, D.C., for Jeffrey Thompson.

Nina Kraut, Washington, D.C., for Raynice Thompson.

Idus Daniel, Washington, D.C., for Katrina Wade.

Carmen Daniels, Washington, D.C., for Troy Johnson.

CHARLES R. RICHEY, District Judge.

The second trial in the above-captioned drug conspiracy case is set to begin on February 26, 1990. The jurors in the recently completed trial of the "Group I" defendants were anonymous and sequestered. Their identities were concealed from the government, the defendants, counsel for both the prosecution and the defense, the Court, and even one another. The government has filed a motion requesting that the Court take the same measures in the second trial. On January 31, 1990, the Court held a hearing on the issue of jury anonymity. After considering the arguments advanced by counsel on both sides and engaging in a careful balancing of all the pertinent factors involved—the seriousness of the charges, the very real threat of violence, the extensive publicity, the importance of a meaningful *voir dire* process, and the defendants' presumption of innocence—the Court has determined that the use of an anonymous, sequestered jury in the second trial is particularly appropriate.[1]

Although the Group I defendants' trial was the first time a court in this jurisdiction has utilized an anonymous jury, this procedure is not without precedent. Several cases from the Second Circuit and one from the Third Circuit have explicitly approved the use of an anonymous jury under certain circumstances. *See, e.g., United States v. Tutino*, 883 F.2d 1125 (2d Cir. 1989); *United States v. Scarfo*, 850 F.2d 1015 (3d Cir.), *cert. denied*, —— U.S. ——, 109 S.Ct. 263, 102 L.Ed.2d 251 (1988); *United States v. Persico*, 832 F.2d 705 (2d Cir.1987), *cert. denied*, 486 U.S. 1022, 108 S.Ct. 1995, 100 L.Ed.2d 227 (1988); *United States v. Ferguson*, 758 F.2d 843 (2d Cir.), *cert. denied*, 474 U.S. 841, 106 S.Ct. 125, 88 L.Ed.2d 102 (1985); *United States v. Thomas*, 757 F.2d 1359 (2d Cir.), *cert. denied*, 474 U.S. 819, 106 S.Ct. 67, 88 L.Ed.2d 54 (1985); *United States v. Barnes*, 604 F.2d 121 (2d Cir.1979), *cert. denied*, 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980).[2]

A review of these cases reveals that a court deciding whether to empanel an anonymous jury must balance, on the one hand, the interests of the criminal justice system—protecting the jurors and their families from violence, actual or threatened, and shielding the jurors from the potential taint of extensive trial-related publicity—and, on the other hand, the defendants' interests—conducting a meaningful *voir dire* to permit the intelligent exercise of their peremptory challenges and retaining their presumption of innocence. *See Tutino*, 883 F.2d at 1132–33; *Scarfo*, 850 F.2d at 1022–23; *Thomas*, 757 F.2d at 1362–65 & n. 1. Moreover, the Court agrees with the Third Circuit's approach to the anonymous jury issue:

> The virtue of the jury system lies in the random summoning from the community of twelve "indifferent" persons— "not appointed until the hour of trial"— to decide a dispute, and in their subsequent, unencumbered return to their normal pursuits. *See* 3 W. Blackstone, *Commentaries*, * 378.... Because the system contemplates that jurors will inconspicuously fade back into the community once their tenure is completed, anonymity would seem entirely consistent with, rather than anathema to, the jury concept. In short, we believe that the probable merits of the anonymous jury procedure are worthy, not of a presump-

---

**1.** As a practical matter, sequestering the jury is the only way for the Court to ensure that the jurors in the upcoming trial remain anonymous. Moreover, the crux of the parties' disagreement is whether the jury should be anonymous. Therefore, this Opinion will focus on jury anonymity, recognizing that the decision on that issue will determine whether the jury should be sequestered.

**2.** In addition to the cases cited above, a recent American Bar Association Journal article indicates that the use of anonymous juries is a technique that appears to be slowly gaining popularity among courts. *See* DeBenedictis, *Ruling Incognito*, ABA Journal, Feb. 1990, at 20 (attached hereto and incorporated by reference herein as Exhibit A).

tion of irregularity, but of disinterested appraisal by the courts.

*Scarfo,* 850 F.2d at 1023.

### I. Factors Favoring Anonymity

One of the two main justifications for having an anonymous jury in the upcoming trial is to protect the jurors and their families from violence, threats of violence, or any other type of improper extra-judicial tampering. *See Tutino,* 883 F.2d at 1132–33; *Scarfo,* 850 F.2d at 1023. One way to evaluate the potential danger to jurors is to examine the seriousness of the crimes involved. *See Tutino,* 883 F.2d at 1132; *Thomas,* 757 F.2d at 1364. In this case the concerns about violence or threats of violence are justified and not based on mere speculation. The indictment charges the defendants in the upcoming trial with grave offenses, including conspiracy to violate federal narcotics laws and substantive violations of federal narcotics laws. If convicted, the defendants face substantial terms of imprisonment.

However, because the Court has severed the twenty-nine defendants—most of whom are relatives or close friends—and the charges against them into three separate trials, an analysis restricted to the upcoming trial does not convey a complete picture of the danger involved. The defendants in the second trial were allegedly part of a sophisticated criminal enterprise that imported millions of dollars worth of cocaine from as far away as California; systematically engaged in countless sales of large and small quantities of cocaine throughout the metropolitan Washington area; employed as many as fifty individuals; possessed semi-automatic weapons and submachine guns; and had no compunctions about using intimidation and violence to protect its business. Without prejudging the guilt or innocence of the defendants in the upcoming trial, the Court heard sufficient evidence in the first trial to be convinced that the above recitation accurately

depicts the potential dangerousness of these defendants.

The Group I defendants were all convicted of conspiracy to violate federal narcotics laws, all but two of them were also convicted of various substantive federal narcotics law offenses; and Rayful Edmond, III was found guilty of conducting a continuing criminal enterprise, which carries a mandatory minimum term of life imprisonment without parole. Furthermore, although neither the first trial nor the upcoming trial directly involve any offenses of violence, murder charges are pending against several defendants, including one of the defendants in the upcoming trial.[3] When one considers the charges against the defendants in the upcoming trial in the context of the other offenses charged in this case and against the backdrop of the tightly-controlled, well-organized major cocaine distribution enterprise depicted in the first trial, it is clear that the offenses involved in the second trial are sufficiently serious to warrant the use of an anonymous jury. *Compare Tutino,* 883 F.2d at 1128 (conspiracy to distribute heroin and substantive distribution violations); *Barnes,* 604 F.2d at 130 (conspiracy to distribute heroin and cocaine and substantive distribution violations as well as engaging in continuing criminal enterprise).

Moreover, it by no means follows that security concerns in the upcoming trial have decreased substantially now that Rayful Edmond, III, the leader of the criminal enterprise, has been convicted. The defendants in the upcoming trial include several of Rayful Edmond, III's siblings and his mother. Because Rayful Edmond, III has experienced first-hand the strength of the government's evidence on the conspiracy charge, it is not unreasonable to be concerned that Edmond, through someone acting on his behalf, may take desperate steps to thwart the prosecution of his mother and siblings. In addition, the Court is not so naive as to think that Edmond's being incarcerated would prevent him from commu-

---

**3.** The defendants, Rayful Edmond, III, Jerry Millington, James Antonio Jones, and Columbus Daniels, are charged with a total of three murders. These murder charges will be addressed in a third trial, to be scheduled at a later date. Columbus Daniels is one of the defendants in the upcoming trial.

nicating with his many accomplices and supporters who have not been apprehended and threatening the safety of the jurors or their families. In light of the above, the Court is as convinced as it was before the first trial that "[t]o sit back and wait would 'prove the adage of the futility of locking the barn door after the horse has escaped.'" Court's August 30, 1989 Memorandum Opinion at 1 (quoting *Barnes,* 604 F.2d at 137); *see also Thomas,* 757 F.2d at 1364 ("Justice requires that when a serious threat to juror safety reasonably is found to exist, precautionary measures must be taken.").

Another measure of the likelihood of the jury being influenced by violence or threats of violence is the presence of acts indicating an inclination to interfere with the judicial process. *See Tutino,* 883 F.2d at 1132–33; *Thomas,* 757 F.2d at 1364. The first trial was a veritable cornucopia of attempts to derail the prosecution and attack the integrity of the criminal justice system through improper extra-judicial conduct. A non-inclusive list of such activity follows.

After one of the government's main witnesses, Kathy Sellers, completed her direct testimony and while she was still subject to cross-examination, her mother's home was fire-bombed. Before trial, a potential government witness, Deborah Phillips, was found shot after the government mistakenly sent a letter explaining the terms of her expected cooperation to her house, where she resided with Emanuel Sutton, one of the defendants in the first trial. During the trial, the Court received a telephone call that there was a bomb in the courtroom. A member of the Court's staff was indirectly, if not directly, threatened by one of the defendants. At the close of the defense case, one of the defendants, John Monford, "made hand motions as to load a semi-automatic weapon, point in the direction of [the Court] and simulated firing the weapon twice." Statement of Special Agent John A. Cornille.[4] Another defendant, Melvin Butler, threatened James Mathis, an important government witness, as he was leaving the witness stand. *Id.* On October 16, 1989, during the direct testimony of James Minor, a cooperating witness, the Court observed several defendants glaring threateningly at him. Court's October 19, 1989 Opinion at 8. Several witnesses were so afraid of what could happen to them that they were very reluctant to testify for the government, and at least one witness, who had "valuable information" and was "a first-hand observer of the violence associated with the Edmond conspiracy," refused to testify out of "fear of retaliation against the witness's family." Declaration of Assistant United States Attorney Robert Andary.[5] Finally, a reliable confidential source has informed the FBI that "$30,000 was available to anyone who would kill Alta Rae Zanville," one of the government's key witnesses. Declaration of Special Agent Charles M. Anderson.[6]

Furthermore, it appeared to the Court that the defendants were attempting, through the help of third parties, to discover the identities of the jurors in the first trial. About one month into trial, two defense counsel informed the Court that they had learned the identity of one of the jurors, and one of the attorneys refused to reveal his source on the grounds of attorney-client privilege. On many occasions, the Court and court personnel observed young men and women going in and out of the courtroom, communicating with the defendants by facial and body language, who responded in kind, and glaring at the jury. *See* Declaration of Court Security Officers Supervisor Richard A. Boyd.[7] In light of the foregoing, there is a substantial likelihood that, if the jurors in the upcoming trial were not anonymous, they would be subjected to improper extrajudicial conduct

---

**4.** Attached hereto and incorporated by reference herein as Exhibit B.

**5.** Attached hereto and incorporated by reference herein as Exhibit C.

**6.** Attached hereto and incorporated by reference herein as Exhibit D.

**7.** Attached hereto and incorporated by reference herein as Exhibit E.

or contact.[8]

In addition to protecting jurors and their families from violence or threats of violence, a second reason for utilizing an anonymous, sequestered jury in the upcoming trial is protecting the privacy rights of the jurors and their families. *See Tutino*, 883 F.2d at 1132; *Persico*, 832 F.2d at 717; *Thomas*, 757 F.2d at 1362–63. This case has received extensive publicity, both locally and nationally, in the print and electronic media. Local television and radio stations and local newspapers provided daily coverage of the first trial, and each day members of the media occupied about half of the courtroom. Moreover, after the jury returned its verdict in the first trial, Rayful Edmond, III was interviewed on both national and local television. Most of the defendants involved in this case have strong ties to the local community, and there is wide-spread public interest in this case. Under these circumstances, and keeping in mind that the upcoming trial will involve Rayful Edmond, III's mother and several of his siblings and will probably require the testimony of many of the same witnesses who testified in the first trial, it can be expected that the media will again provide extensive coverage once the trial begins.[9] Although the Court has great respect for the media, anonymity and sequestration measures will serve the additional purpose of ensuring that the jurors are not exposed to members of the media or to publicity about the trial.

## II. Defendants' Arguments Against Anonymity

The Court has carefully considered the defendants' two-prong argument that an anonymous jury would deprive them of the ability to conduct a meaningful *voir dire* and intelligently exercise their peremptory challenges and would infringe upon their presumption of innocence. However, the Court agrees with the cases from the Second and Third Circuits that courts may utilize anonymous juries if they take certain precautions to protect these two significant interests.

While the closely-related rights to obtain information about prospective jurors through the *voir dire* process and to exercise peremptory challenges occupy an important position in our trial procedures, they are "not of constitutional dimension" and limitations thereof "need not be reviewed with the close scrutiny reserved for encroachments on the fundamental rights of an accused." *Scarfo*, 850 F.2d at 1021. Indeed, the trial court has substantial discretion in controlling and limiting the *voir dire* process. *Id.* at 1023; *Barnes*, 604 F.2d at 137; *see also United States v. LaRouche*, 896 F.2d 815, 829 (4th Cir.1990).

Contrary to what the defendants' position seems to be, it is well-established that attorneys do not have the right to learn *everything* about a prospective juror. *See Tutino*, 883 F.2d at 1133 (although questioning must be fair, it need not include specific points raised by a particular defendant); *Barnes*, 604 F.2d at 140 (reviewing "numerous cases in which a trial court's decision to limit *voir dire* has been sustained because the matter sought to be probed by the defendant was too remote

---

8. While the defendants in the upcoming trial correctly point out that there is no evidence *directly* linking them to any of the misconduct listed above, that in no way diminishes the potential for violence or improper extra-judicial conduct. The Court is concerned not only about acts that these defendants could commit but also about acts that could be committed by others, who support or sympathize with these defendants to the extent that they may resort to violence or threaten violence, *regardless* of whether these defendants direct them to do so.

9. Contending that the publicity about the upcoming trial is minimal, the defendants make

much of the fact that relatively few reporters have attended the pretrial proceedings. However, the pretrial proceedings in the first trial similarly attracted relatively little publicity and few reporters. It was only once the *voir dire* proceedings began that the publicity mushroomed to the point of extensive daily coverage and attendance by many media representatives. Thus, at least under the circumstances of this case, the publicity generated by the pretrial proceedings in the upcoming trial does not adequately measure how much publicity the trial itself may receive.

from the issues in the case to warrant intrusion into the potential jurors' private thoughts"). As the *Barnes* court correctly noted:

> The law as to jury selection is not so unbending that it cannot, or should not, be accommodated to the realities of modern day trials in large narcotics cases which have created such problems for the courts in large cities. Clarence Darrow's ideal has already yielded to what has been thought to be the greater necessity, *i.e.*, the need to streamline the *voir dire* process by resting the control of it in the district judge, *see* Fed.R.Crim.P. 24(a), subject to the demand that the *essentials of the case* should be the subject of inquiry. If that demand is satisfied, then so will have been the rights of the parties.

*Barnes*, 604 F.2d at 142–43 (emphasis added; footnote omitted).

The most important aspect of this *voir dire*/peremptory challenges issue is that, when a court takes appropriate measures, attorneys for both sides receive *more* material information about members of an anonymous jury than they do in ordinary trials in which jurors identify themselves by name and address. The Court uses the term "material" advisedly, because "[a] trial judge is required to permit at least some questioning with respect to any material issue that may actually or potentially arise during the trial." *Tutino*, 883 F.2d at

1133; *see Barnes*, 604 F.2d at 137–38 (discussing *Aldridge v. United States*, 283 U.S. 308, 51 S.Ct. 470, 75 L.Ed. 1054 (1931)). Under this Court's procedures, prospective jurors are told to sit down and answer the juror questionnaire in writing without consulting anyone.[10] These procedures give prospective jurors more opportunity for reflection and elicit more mature, accurate responses than attorneys ordinarily receive in normal criminal trials through the oral *voir dire* process covering the basic principles of law. Thus, these procedures together with the juror questionnaire enhance rather than diminish the defendants' rights to exercise their peremptory challenges and to be tried by a fair and impartial jury.

The only pieces of information about the prospective jurors that counsel will definitely not be able to obtain in the upcoming trial, as in the first trial, are: (1) their names; (2) their street addresses; and (3) their places of employment or business,[11] although counsel will know the kinds of employment that the prospective jurors and those close to them have had over the last ten years. The defendants have not made any showing that these three pieces of "off limits" information are material to any issue that may arise at trial. Through a very extensive, 23–page juror questionnaire, attorneys for both sides will acquire a wealth of demographic and other information.[12] *See Scarfo*, 850 F.2d at 1022

---

**10.** The Court's complete directions to the prospective jurors, which the Clerk of the Court will read to them before they answer their individual juror questionnaires, are attached hereto and incorporated by reference herein as Exhibit F. The Court used essentially the same directions in the first trial.

**11.** It should be noted that, to the extent not knowing this information handicaps an attorney, both sides are "equally in the dark," *Barnes*, 604 F.2d at 142, because neither the prosecutors nor the defense attorneys will have access to that information.

**12.** The juror questionnaire that the Court will use in the upcoming trial is attached hereto and incorporated by reference herein as Exhibit G. The questionnaire elicits information including but not limited to: how old the jurors are; where they were born; in which quadrant of the city they live in; what their marital status and

family configuration are; whether they own a home; how long they have lived in the District of Columbia; what kinds of jobs they have held in the past ten years and what their current employment status is; what their educational backgrounds are; what their hobbies and recreational activities are; whether they have ever been jurors before; whether they have any health problems; whether they have been parties to any civil or criminal court proceedings; whether they or any member of their immediate family have worked in law enforcement; whether they have served in the military; to what extent they or members of their immediate family have had prior involvement with drugs; whether any of them know any of the participants in the current trial; the extent, and sources, of their knowledge about this case; whether they belong to any clubs or organizations that take a position on drugs. *Compare Tutino*, 883 F.2d at 1133; *Barnes*, 604 F.2d at

(written questionnaire submitted to prospective jurors encompassed broad range of personal demographics). In addition, all counsel will have the same opportunity as usual to view the demeanors of the prospective jurors and to uncover additional, more specific information relating to possible juror bias through meaningful *voir dire* consisting of questions on material issues that may arise at trial. In sum, on the *voir dire* and peremptory challenge issue, this Court arrives at the same conclusion as the district court in *Scarfo:* "counsel [will be] in a much better position to assess the suitability of prospective jurors in this case than in most other trials, criminal or civil." *Id.*

Finally, the Court disagrees with the defendants' argument that jury anonymity necessarily destroys their presumption of innocence. "The anonymity feature ... is not *intrinsically* suggestive of any inference of guilt." *Id.* at 1026 (emphasis added). Indeed, those who have never served on juries before could assume, unless informed otherwise by the Court, that identification of jurors by number instead of by name is a standard practice in all criminal cases. *See id.* Furthermore, under certain circumstances, the presumption of innocence may be burdened to accommodate other important interests. "[A]lthough the presumption of innocence is of significant importance, and is protected by the due process clause of the Fifth Amendment, there is no *per se* rule that it may not be burdened." *Thomas,* 757 F.2d at 1364 (discussing accepted practice of not revealing names and personal information of potentially endangered witnesses); *see Scarfo,*

850 F.2d 1024–25 (Supreme Court has, under certain circumstances, approved security measures such as having armed, uniformed State troopers present in courtroom during trial or shackling and gagging particularly disruptive defendants).

Instead, the Court agrees with the Second Circuit that it is not, and should not be, the law that jurors must publicly disclose their identities and publicly take responsibility for their verdict. *Barnes,* 604 F.2d at 140. To the contrary:

> If a juror feels that he and his family may be subjected to violence or death at the hands of a defendant or his friends, how can his judgment be as free and impartial as the Constitution requires? If "the anonymous juror feels less pressure" as the result of anonymity, this is as it shou'.d be—a factor contributing to his impartiality.

*Id.* at 140–41 (citation omitted). Even assuming *arguendo* that jurors would be influenced by their anonymity, "the defense's assumption that anti-defendant bias is the only possible, or even the most likely, reaction is suspect. Predicting juror responses to the anonymity practice is pure speculation." *Scarfo,* 850 F.2d at 1026. In the Court's view, anonymity is more likely to dispel jurors' apprehensions and therefore "serves the ideal of dispassionate judgment." *Id.*

In any event, the Court will do everything in its power to ensure that the defendants in the upcoming trial retain their presumption of innocence. As in the first trial, the Court will give the jurors a neutral explanation for their anonymity and sequestration.[13] Other courts have ap-

135–36. The Court used essentially the same questionnaire in the first trial.

**13.** As the prospective jurors in the first trial were told, prospective jurors in the upcoming trial will be instructed as follows:

> It is a common practice followed in many cases in the Federal court to keep the names and the identities of the jurors in confidence. This is in no way unusual. It is a procedure being followed in this case to protect your privacy even from the Court. Accordingly, you will note in the first two questions you will give your name and all identifying information. This identifying information will be

> maintained by the Clerk of the Court, and is for the Clerk's Office only, and will not be given to anyone including the Court or the lawyers for either side except in special circumstances or for good cause as determined by a Judge of this Court. In the remainder of the questionnaire, after those first two questions, you are not to write your names or the names of any persons you are connected with, or your employer, or your addresses, or any identifying information.

Exhibit F at 2–3. This is almost verbatim the same instruction used by Judge Leval and approved by the Second Circuit. *See Tutino,* 883 F.2d at 1133; *see also Thomas,* 757 F.2d at

proved such a practice, recognizing that it minimizes the risk that empaneling an anonymous jury may deprive the defendants of their presumption of innocence. *See Tutino,* 883 F.2d at 1133; *Thomas,* 757 F.2d 1364–65 & n. 1.

The Court will, of course, also give the jurors in the upcoming trial the standard presumption of innocence instruction. Beyond a certain point, courts must simply trust that jurors will abide by the instructions that judges give them.

> Essentially, trials in criminal cases depend on the intellectual integrity and common sense of those chosen to decide whether the prosecution has met its burden. The constitutional guarantee of trial by jury is premised on the fundamental belief that juries will follow the law, that they will not convict on mere suspicion but will instead require proof beyond a reasonable doubt. The citizens of this country have placed their faith in the jury system and the courts are obliged to honor that tradition.

*Scarfo,* 850 F.2d at 1025 (citations omitted). This Court has every confidence that the jury in the upcoming trial will abide by the Court's instructions and will presume the defendants innocent until the prosecution has proved beyond a reasonable doubt each element of the crimes with which the defendants are charged.

### III. Conclusion

Upon consideration of the parties' submissions and the entire record in this case,

1364–65 & n. 1 (Judge Pollack's instruction to

the Court holds that the threat of violence or other improper extra-judicial conduct or contact combined with the extensive media coverage require that the jury in the upcoming trial be anonymous and sequestered. Moreover, the Court is satisfied that the measures it plans to take—including using an extensive juror questionnaire, conducting a meaningful *voir dire* on all material issues, and providing the jurors with a neutral explanation for their anonymity—will enable the defendants to intelligently exercise their peremptory challenges and will adequately protect their presumption of innocence.

An Order in accordance with the foregoing Opinion will be issued of even date herewith.

### ORDER

In accordance with the Court's Opinion of even date herewith, upon consideration of counsels' arguments made orally at the January 31, 1990 hearing and in writing, and based upon several discussions with counsel dating back to the arraignment on May 24, 1989 and continuing after the end of the first trial, together with the entire record herein, it is, by the Court, this 5th day of February, 1990,

ORDERED that the jury in the upcoming trial of *United States v. Rayful Edmond, III, et al* shall be anonymous and sequestered.

anonymous jury).

EXHIBIT A

## Save 25-35%
## LEGAL CASES

72

16-4W

1016

**Free Color Catalog Available Upon Request.**

**Model 72** - Top Grain Cowhide, key locks, two inside partitions. Colors. Dark Brown, Black Sizes. 18" × 12½" × 7", 20" × 13" × 8".

**Model 16-4W** - Top Grain Cowhide, 6 hole plate and swivel for lock, 4 inside pockets Colors· Dark Brown· Oversized to 18" × 13" × 10".

**Model 1016** - Top Grain Cowhide, all around straps, steel frame support, heavy duty key lock, 2 inside partitions. Colors· Dark Brown, Black Sizes: 18" × 12½" × 7½", 20" × 13" × 8".

| | Retail | 1-4 Cases | 5-24 Cases |
|---|---|---|---|
| 72 18' | $177.00 | $123.50 | $118.50 |
| 72-20' | $199.00 | $136.00 | $131.00 |
| 16-4W | $194.00 | $136.50 | $131.00 |
| 1016-18" | $180.00 | $127.00 | $121.00 |
| 1016 20" | $202.00 | $138.50 | $132.50 |

All Prices Include Shipping Charges to locations in continental USA (Hawaii, Puerto Rico, and Alaska add $10.00 per case for shipping)

Order by:

Visa, Master Card, or American Express or mail a check to:

### R.F. Young Co., Inc.

*Dept. B* — P.O. Box 40005 **Indianapolis, IN 46240**

*800-227-9340 Ext. 200*

FAX: 317-843-0738

Circle 43 on Reader Service Card

## News

# Ruling Incognito

### Jurors remain anonymous in a growing number of trials

ABAJ/RICHARD SHAY

Tocco lawyer Patrick Tuite of Chicago with the drawing he commissioned.

On the 6th of December, 12 jurors in Washington, D C , convicted a 25-year-old reputed drug lord named Rayful Edmond III of running a continuing criminal enterprise that controlled 30 percent of the capital's cocaine market.

The next day in Chicago, another 12 jurors convicted Albert Tocco of 34 racketeering and extortion counts for gouging a "street tax" from car thieves and "chop shops" from the city's South Side and down into northwest Indiana.

Attorneys for Edmond and Tocco vowed to appeal. and both said prominent among the issues would be one fact the two cases had in common: Neither the lawyers nor their clients, nor even the prosecutors nor judges, knew who the jurors were. Both juries had been kept anonymous.

The use of anonymous juries is a fairly new technique that appears to be slowly gaining popularity among prosecutors and courts. They say it is proper when there is a reasonable possibility of jury tampering or threats.

For instance, both Edmond and Tocco were accused of heading powerful crime organizations that police tied to dozens of murders. Witnesses in both cases had been threatened or worse, prosecutors said.

"We want a jury that will not be afraid to return a verdict based on the evidence simply because they've been identified," said Dean Polales. the assistant U S attorney in Chicago who prosecuted Tocco "An anonymous jury protects the jury and ... protects the integrity of the trial."

**Guilty Presumption**

Defense lawyers perceive a different motive. "The only reason I can see is to prejudice the jury," said David Breitbart, the New York lawyer who defended what appears to be the first anonymous jury case in 1977

The very fact of their anonymity tells jurors the defendant is dangerous, defense attorneys say "It's a tremendous tactical advantage for the prosecution," Breitbart grumbled "Instead of a presumption of innocence, there's a presumption of guilt "

Most of the cases have been against reputed leaders of large crime organizations such as Tocco, Edmond and Breitbart's client, Leroy Barnes, who led a Harlem narcotics ring Still other cases have involved Chicago's powerful street gang, the El Rukns, and alleged political terrorists tied to groups like the Weather Underground or the Puerto Rican FALN.

More courts seem to have kept-

jurors' identities secret lately. For instance, the Edmond case was the first use of the technique in the District of Columbia. New Jersey's first anonymous jury convicted Louis Manna, third-ranking leader of the Genovese crime family, of murder and attempted murder in June.

But·in mid-December, a Manhattan judge refused to allow John Gotti, an alleged boss of the Gambino crime family, to be tried by what would have been the second anonymous jury in a New York state court Justice Edward J. McLaughlin ruled not disclosing jurors' names was allowed under the state and federal constitutions, but barred by state criminal-procedure law.

Federal appeals courts have approved anonymous juries in the half-dozen or so cases to go up, rejecting arguments that the practice hinders defendants' right to challenge jurors and that it prejudices jurors. "The government has won every time," said Chicago's Polales.

In the most recent ruling, *United States v. Scarfo*, 850 F.2d 1015 (1988), involving the reputed boss of the Philadelphia La Cosa Nostra, the 3rd U.S. Circuit Court of Appeals held the technique "is supported by respectable legal authority and grounded in legitimate concerns for juror safety."

The court said keeping the jury anonymous "allayed the jurors' fears of retaliation against themselves and their families and so promoted impartial decision making."

That rationale is just silly, according to William H. Murphy Jr. of Baltimore, who is Rayful Edmond's lead attorney. "Anybody with the common sense to be on a jury can tell they're not being protected from the government, they're not being protected from the defense lawyers, they're being protected from the defense lawyers' clients. ...

"I mean, give me a break!"

Murphy had sought a change of venue out of Washington, mostly because of pretrial publicity but also as an alternative to some of the extensive security measures that marked the Edmond trial. Besides the anonymity for the jury, U.S marshals ringed the courtroom and spectators were kept behind bulletproof glass.

But most prosecutors don't think a change of venue is always enough. In a 1987 case against members of the El Rukn gang in Chicago, federal prosecutors first had the trial moved to Rockford, Ill., and still used an anonymous jury.

Anyway, commented Polales, "There's no bar to the traveling hit man moving in interstate commerce."

Polales' opponent in the Tocco case, Patrick Tuite of Chicago, counters that a certain amount of risk is part of the job for criminal jurors, as it is for attorneys and judges. "People don't want to be witnesses either, and witnesses get killed," Tuite said "You do it because it's your duty."

Tuite so dislikes the practice, he commissioned a courtroom artist to draw a picture of the Tocco jurors with bags over their heads

Gerald Uelmen, a criminal law professor and the dean of the University of Santa Clara Law School in California, finds some irony in anonymous juries. After all, he said, jurors used to be neighbors, drawn from a community because they knew the litigants best.

*—Don J. DeBenedictis*

## British Buyout

### Reed acquires U.S. legal publisher

Reed International P.L.C., the British parent company of legal publisher Butterworth's Group, has announced its American subsidiary will buy Martindale-Hubbell Inc. for $303.7 million.

Butterworth's, which publishes directories of lawyers and architects, is "the UK equivalent of Martindale-Hubbell," said Reed spokesman Robert McDermott.

The "Martindale-Hubbell Law Directory" describes the backgrounds of 700,000 attorneys and 44,000 law firms. Its soon-to-be new owner, Reed Publishing (USA) Inc., owns Cahners Publishing Co., the publisher of about 70 trade and consumer magazines, including *Variety* and *Modern Bride*.

Reed Publishing will operate Martindale-Hubbell with its R.R. Bowker subsidiary, publisher of books and periodicals such as "Books in Print" and "Literary Market Place."

# Where the business elite meet in Tokyo.

Where else but at the Hotel Okura? With its elegant accommodations, incomparable service, renowned restaurants and premier location, it's everything a world-class hotel should be.

*Hotel*

*Okura*

**TOKYO**

TEL· (03) 582-0111 TELEX· J22790 FAX: (03) 582-3707
one of *The Leading Hotels of the World*
See your travel agent or our hotel representatives
The Leading Hotels of the World.
Tel 800 223 6800 Toll Free. 212-838 3110 Collect
R.F. Warner, Inc., New York
Tel 800 888 1199 Toll Free
J A Tetley Co., Inc., Los Angeles
Tel 800 421 0000 Toll Free. 213 388 1151

1154

**U.S. Department of Justice**

*United States Attorney*

*District of Columbia*

*Judiciary Center*
*555 Fourth St. N.W.*
*Washington, DC 20001*

Statement of John A. Cornille, Special Agent Drug Enforcement Administration

During the first of a series of three trials in the Rayful EDMOND, et al Drug Conspiracy case, S/A John Cornille was present in and around the courtroom as the Case Agent. At the end of the day at the close of the defense case, I was present in the courtroom when one of the defendants, John Monford, made hand motions as to load a semi-automatic weapon, point in the direction of Judges Charles Richey and simulated firing the weapon twice. John Monford then called out this Agents last name and did the same in my direction. These actions were as the Judge was leaving the Bench and had his back turned towards the defendants. This action was observed by many persons in the courtroom and one of which was the news media. These actions were reported on the nightly news and the composite artist schetched John Monford and that was also shown on Channel 7 and maybe other stations.

Another incident that was witnessed by me was when the government witness James Mathis was leaving the stand at the end of his testimony, defendant Melvin Butler said,"I'm going to fuck you up". This was heard by S/A Cornille and the witness James Mathis for we spoke of the remark as I escorted him out of the courtroom.

John A. Cornille, S/A
Drug Enforcement Administration
Department of Justice

EXHIBIT C

**U.S. Department of Justice**

United States Attorney

*District of Columbia*

---

*Judiciary Center*
*555 Fourth St. N W.*
*Washington, DC 20001*

## DECLARATION OF ASSISTANT UNITED STATES ATTORNEY ROBERT ANDARY

As part of the government trial team in United States v. Rayful Edmond III, et al., which was tried in the period September 11 - December 6, 1989, it was my responsibility to prepare witnesses and to present their testimony during the trial. In addition, I participated in the presentation of evidence to the federal grand jury which returned the indictments in this case, during the period February - June, 1989.

The majority of the non-law enforcement witnesses I came in contact with during this period expressed great fear and anxiety about testifying publicly in this trial. The witnesses were concerned about retaliation against themselves or their families because of their testimony, and assisting them to cope with this fear was a constant part of preparing and presenting the evidence in this case. Even several witnesses whose only role was to sell merchandise to the defendants were reluctant to testify because of their concern about retaliation. In some instances the fear of retaliation deprived the government of valuable testimony which would have strengthened the government's case against the conspirators. One witness in particular comes to mind in this regard. The witness had provided valuable information during the investigatory stage of the proceeding, but fear of retaliation against the witness's family caused the witness to refuse to provide public testimony despite the fact that such testimony would have resulted in a significant benefit to the witness. No amount of reasoning with or assuring the witness could overcome the witness's reluctance to testify. The witness's wishes were ultimately respected and the witness did not testify at trial. It is noted that the witness was a first-hand observer of the violence associated with the Edmond conspiracy, and the witness's fears were therefore based on experience rather than speculation alone.

Already, during the motions hearing in this case, I have had a civilian witness express concern for the witness's safety as a result of the witness's testimony connected to this case. While the witness based these concerns on reputation rather than experience, it demonstrates that fear of retaliation will be a factor in preparing and presenting the government's case in this second conspiract trial.

*Robert G. Andary*
ASSISTANT UNITED STATES ATTORNEY

EXHIBIT D

January 26, 1990

I Charles M. Anderson, Special Agent, FBI, do hereby swear:

On or about October 10, 1989, I received information from other special agents of the Federal Bureau of Investigation that a confidential source who has provided information to the FBI for approximately four years and who is responsible for numerous arrests, indictments, convictions, and seizures, and who has never been known to provide unreliable information, advised that $30,000.00 was available to anyone who would kill Alta Rae Zanville.

Charles M. Anderson
Special Agent
Federal Bureau of Investigation
1900 Half Street S.W.,
Washington, D.C. 20535

EXHIBIT E

On the 10th of Oct. 1989, during the trial of Mr. Edwards, numerous defendants were making motions to people in the audience. The people in the audience were also waving to the defendants. The audience was warned not to do this but it usually happens during at recess when the defendants are moving out of the court room, and the audience area is being cleared. Defendants were making thumbs up signs and the audience was returning the same. Richard A Boyd

I Richard A Boyd do solemly swear this is a true statement.
Richard A Boyd

## EXHIBIT F
### PRELIMINARY STATEMENT TO BE READ TO JURY VENIRE BY THE CLERK

Ladies and Gentlemen, you have been brought here today to perform an important duty of citizenship, namely, Jury Service. The right to trial by Jury is among the most important rights guaranteed to all of us as Americans. Everyone knows that Jury Service entails some sacrifice from our usual endeavors and the pleasures of life, but Jury service is essential in our constitutional system of government in the Republic known as the United States of America. If people in this and other communities across America were to refuse to serve merely because of the inconvenience and sacrifice entailed in being away from our families, jobs, and usual endeavors, then our system of justice would fail. The same duty to serve applies equally to cases involving disagreeable or unpopular matters.

Now having said these things, the Court has instructed us to ask you to carefully review the questionnaire which will be handed to you in a few moments. Please review each question carefully, and then write out your answer to each question. The purpose of having you answer the questionnaire in advance is to insure that you will have time for reflection so as to give complete and accurate answers to each question. This information will later be used by the lawyers to decide which of you will serve.

If you encounter a question that you believe invades your privacy in a material or substantial way or embarrasses you, then you may request at the place provided on the Questionnaire at question 35 an opportunity to discuss it with the Presiding Judge. You must make an affirmative request for such a discussion with the Judge, and give your reasons therefore, and the Judge will then decide the matter of how and the manner in which your answer should be provided. You may be confident that the Court is very much concerned that your privacy be respected to the very limit allowed by the law.

A few last words about the questionnaire. It is a common practice followed in many cases in the Federal court to keep the names and the identities of the jurors in confidence. This is no way unusual. It is a procedure being followed in this case to protect your privacy even from the Court. Accordingly, you will note in the first two questions you will give your name and all identifying information. This identifying information will be maintained by the Clerk of the Court, and is for the Clerk's Office only, and will not be given to anyone including the Court or the lawyers for either side except in special circumstances or for good cause as determined by a Judge of this Court. In the remainder of the questionnaire, after those first two questions, you are not to write your names or the names of any persons you are connected with, or your employer, or your addresses, or any identifying information.

Now this is a criminal case in which the defendants have denied all of the charges against them. The law presumes them not guilty of these charges, and gives them a right to a trial by jury. The Government bears the burden of proving its case as to each defendant beyond a reasonable doubt. The defendants do not have to prove or disprove anything at all.

The trial is expected to last about eight weeks and will require a sacrifice by all involved. You have been selected randomly, as citizens of the community, as we choose all juries in the Federal Court in the Nation's Capital. There will be twelve jurors ultimately chosen, along with six alternates. Court will begin at 9:30 a.m. and continue throughout the day, and sometimes until the evening hours, with time off for lunch and recesses for the Court and lawyers to consider legal matters of no significance to you. These recesses will be a time for you to relax, but you will not be allowed to discuss the case with anyone, not even among yourselves, until those of you who have been chosen have heard all of the evidence, and the Court instructs you as to the law and advises you that you can discuss the case.

The Marshals assigned to you will be available to see to your comfort to the maximum extent possible under the supervision of the Court.

Now just a word about your job as Jurors. As Jurors in this case, you must promise to keep an open mind as to each defendant and then render a fair and impartial verdict based <u>exclusively</u> upon the evidence and the law as to each defendant as the Court will instruct you during the trial. In other words, Ladies and Gentlemen, it is your duty as Jurors to put aside <u>any and all personal opinions</u> you have about the nature of the case, the charges, and/or any defendant until you have seen and heard all of the evidence in the case and the Court has instructed you on the law to be applied to the evidence seen and heard by you in the Courtroom during the trial. This is the core of the American system of justice, and it is your civic obligation as jurors to abide by this principle.

As you were advised in the beginning, we know that Jury service is an inconvenience, but it bears repeating that it is an important duty of citizenship which no one should shirk or seek to avoid. Otherwise, our system of justice would break down and no one loyal to this country would want that. The Court does not know exactly how long the trial will take, but the lawyers estimate its length will be about eight weeks. It could be much shorter or slightly longer, but the Court simply does not know at this time. However, you may be assured that the Court will move the trial along as quickly as possible consistent with the law, and the requirement of justice both to the Government and each of the defendants.

### EXHIBIT G
### JUROR QUESTIONNAIRE
(for a criminal case)

Juror No. _____

Upon your oath or affirmation you shall give true and complete answers to all questions. The information requested by this questionnaire will be used to assist the Court and counsel in the jury selection process and to complete said process as efficiently as possible.

Please complete the questionnaire by printing your answers legibly in the spaces provided. Do not discuss the questionnaire or your answers with fellow jurors; your answers are to be your answers, and your answers alone. Bear in mind that your answer to each question must be correct and complete. This page and page twenty-three (23) will be maintained by the Clerk of the Court and not be given to anyone including the Court or the lawyers for either side except in special circumstances or for good cause as determined by a Judge of this Court. Pages two (2) through twenty-two (22) will be made available to counsel and the Court.

PLEASE PRINT YOUR LAST NAME

1) Please print your full name: _____

2) Please print your address: _____
_____

Juror No. _____

3(a) In what quadrant of the city do you live?
(b) NE ___ NW ___ SE ___ SW ___
How long have you lived at your current address? _____
(c) Do you own your own home?
Yes ___ No ___

4(a) How old are you? _____
(b) In what state were you born (if you were not born in the United States, please provide the country in which you were born)?

5) How long have you lived in the District of Columbia?

6) What is the highest grade you completed in school?

If you attended college, list your major areas of study.
_____
_____

7) Do you have any difficulty reading, speaking, or understanding the written or spoken English language?
Yes ___ No ___
If "yes," briefly explain: _____
_____

8) Do you have any health problems, such as vision problems, hearing problems, or any current physical or emotional problems?
Yes ___ No ___
If you have such a problem, please explain: _____
_____

9(a) Are you currently:
Employed full-time (over 30 hours per week) _____
Employed part-time (5 to 30 hours per week) _____
Unemployed _____
Unemployed but looking for work _____

Retired _____
A student _____
A homemaker _____

(b) If you are employed or were employed, please describe any jobs or occupations that you have held over the past ten years, without giving the names or addresses of your employers.

_____
_____
_____
_____
_____
_____
_____

(c) Were you a supervisor and, if so, how many people did you supervise?

_____
_____

10(a) What is your current marital status?
Married _____
Separated _____
Divorced _____
Widowed _____
Never married _____

(b) If you are married, is your spouse currently:
Employed full-time (over 30 hours per week) _____
Employed part-time (5 to 30 hours per week) _____
Unemployed _____
Unemployed but looking for work _____
Retired _____
A student _____
A homemaker _____

(c) If your spouse is or was employed, please describe any jobs or occupations that your spouse has held over the past ten years, without giving the names or addresses of your spouses's employers.

_____
_____
_____
_____
_____
_____
_____

11) Describe generally the occupations of your adult children, without providing the names or addresses of their employers.

_____
_____
_____
_____
_____
_____
_____

12) Have you ever served in the military?
Yes ___ No ___
If "yes," please list the branch, your rank at the time of discharge, and the place and date of your service.

13(a) Have you, or has any member of your immediate family, ever studied the law, had any legal training, or been employed by a law firm engaging in the practice of law?
Yes ___ No ___

(b) If "yes," will you agree to put such study and training aside and accept the law applicable to this case as the Court gives it to you?
Yes ___ No ___

(c) If "no," please explain briefly: _____

_____
_____

14) Have you, or has any member of your immediate family, ever been involved as a party to or appeared as a witness in any court proceeding (civil or criminal) or in any investigation by a federal or state authority or by an official legislative body or agency?
Yes ___ No ___
If "yes," please explain briefly:

_____

15(a) Have you ever served on a grand jury?
Yes ___ No ___
If "yes," how many times?

When? _____
Were any of the cases drug or homicide cases?
Yes ___ No ___

(b) Have you ever been a petit juror before?
Yes ___ No ___
If "yes," how many times?

When? _____
How many civil cases? _____
How many criminal cases? _____
Were any of the cases drug or homicide cases?
Yes ___ No ___

16) Would your experience in any situation covered by 14 and 15, above, affect your ability to be a fair and impartial juror in this case?
Yes ___ No ___
If "yes," please explain: _____

17(a) During the course of the trial, evidence will be introduced in the form of tape recordings of telephone conversations obtained either by a court-authorized wiretap or the consent of one of the parties to the conversation. In these conversations, you may hear evidence from an accomplice—that is, a person who is alleged to have participated in the crimes charged. You may also hear evidence from informants and law enforcement agents who will testify that they acted in

an undercover capacity in order to collect evidence for the Government. The use by the Government of these procedures is lawful. The jury should consider such evidence along with the other evidence in the case, giving it as much or as little weight as you think it deserves. Would you have any difficulty being able to evaluate this evidence as instructed by the Court?

Yes ___ No ___

If "yes," please briefly explain:

_____
_____
_____
_____

(b) In some of the tape recordings, the parties being recorded may use profanity, curse, and swear. Would the use of such language prevent you from evaluating this evidence as a fair and impartial juror?

Yes ___ No ___

If "yes," please explain: _____

_____
_____
_____

18) Have you, or has any member of your immediate family or a close friend, ever been employed by or received training from any local, state or federal law enforcement agency, including but not limited to the following:

(Check as many as apply for each category)

| | Self | Close Relative | Close Friend |
|---|---|---|---|
| F.B.I. | ___ | ___ | ___ |
| U.S. Attorney | ___ | ___ | ___ |
| District Attorney | ___ | ___ | ___ |
| Internal Revenue Service | ___ | ___ | ___ |
| Drug Enforcement Administration | ___ | ___ | ___ |
| Military Police | ___ | ___ | ___ |
| Prison Guards | ___ | ___ | ___ |
| State Troopers | ___ | ___ | ___ |
| Police Department | ___ | ___ | ___ |
| Sheriff's Department | ___ | ___ | ___ |
| U.S. Marshal | ___ | ___ | ___ |
| Alcohol, Tobacco & Firearms | ___ | ___ | ___ |
| Immigration & Naturalization Service | ___ | ___ | ___ |
| Customs Service | ___ | ___ | ___ |
| Federal Court System | ___ | ___ | ___ |
| District of Columbia Court system or a state court system | ___ | ___ | ___ |
| Department of Justice | ___ | ___ | ___ |
| Other law enforcement agency not listed above | ___ | ___ | ___ |

Do you have an application for employment pending at any of the law enforcement agencies listed above?

Yes ___ No ___

If "yes," please specify which agency or agencies?

_____
_____

19) Have you, or has any member of your immediate family, ever received training or been employed in the following areas: (Check as many as apply for each category)

| | Self | Close Relative | Close Friend |
|---|---|---|---|
| Private Security/Security Guard | ___ | ___ | ___ |
| Private Investigation | ___ | ___ | ___ |
| Insurance Adjustment | ___ | ___ | ___ |
| Credit Investigation | ___ | ___ | ___ |

20) Have you, or has a member of your immediate family or a close friend, ever worked in a job for the Senate or House of Representatives or with or for any congressional committee or activity, the District of Columbia City Council, or any other legislative body?

Yes ___ No ___

If "yes," please briefly explain the subject matter of the job, and describe the nature and scope of the work:

_____
_____

21) Have you, or has any relative or close friend, ever used, overdosed on, or been addicted to any illegal drug, including, but not limited to, cocaine, PCP, heroin, marijuana, LSD, and speed?

Yes ___ No ___

If "yes," please briefly explain:

_____
_____

22(a) Have you, or has a member of your immediate family or a close friend, ever been the victim of a crime, a witness to a crime, arrested, or a defendant charged with or convicted of a criminal offense (probation is considered a conviction).

Yes ___ No ___

If "yes," please briefly explain, and include date(s) and name of court if there was a court proceeding.

_____
_____

(b) Will the experience(s) you described above affect your ability to render a fair and impartial verdict in this case?

Yes ___ No ___

(c) What are your thoughts or feelings about how the police, the prosecutor, and the defense lawyer(s) handled the case in question? In other words, were you satisfied?

Yes ___ No ___

If "no," please explain briefly:

_____

23(a) Do you have any preference, bias or prejudice concerning the police, the Department of Justice, the FBI, or law enforcement agencies generally that would cause you to be prejudiced either in favor of or against the Government in a criminal prosecution?

Yes ___ No ___

(b) Do you have any preference, bias or prejudice concerning persons charged with crimes or the lawyers who represent them that would cause you to be prejudiced either in favor of or against persons charged with crimes in a criminal prosecution?

Yes ___ No ___

24) The law is that the testimony of law enforcement officers is to be given no lesser or greater weight than that of any other witness. Would you have any difficulty in accepting this proposition of law?

Yes ___ No ___

25) Do you personally, or does any member of your immediate family, know or have any connection (personal, business, or social) with:

Betty Ann Soiefer
Robert G. Andary
Barry Tapp
Charles E. Ambrose, Jr.
Assistant United States Attorneys
The United States Attorney's Office
Narcotics Section
Judiciary Center Building
555 Fourth Street, NW
Washington, DC 20001

Yes ___ No ___

If "yes," please specify: _____

26) Do you personally, or does any member of your immediate family, know or have any connection (personal, business, or social) with the following lawyers or their families, partners, or associates:

Thomas Abbenante
1919 Pennsylvania Avenue, Suite 200
Washington, DC 20006

James Michael Bailey
910 17th Street, NW
Washington, DC 20006

Catherine Brown
419 7th Street, NW, Suite 401
Washington, DC 20004

Joseph R. Conte
Bond, Conte & Norman, PC
1819 H Street, NW, Suite 1125
Washington, DC 20006

Idus Daniel, Jr.
1010 Vermont Avenue, NW, Suite 618
Washington, DC 20005

John Drury
Drury and Brennan
1625 I Street, NW, Suite 1009
Washington, DC 20006

William Garber
301 Eye Street, NW
Washington, DC 20001

Elise Haldane
301 Eye Street, NW
Washington, DC 20001

Dennis M. Hart
301 Eye Street, N.W.
Washington, D.C. 20001

Gwen Hickman
5109 Leesburg Pike, Suite 405
Falls Church, VA 22041

Richard Huber
1706 R Street, NW
Washington, DC 20009

Carmen Jacobs
1915 I Street, NW, Suite 500
Washington, DC 20006

Stuart F. Johnson
406 5th Street, N.W.
Washington, DC 20001

Gary Kohlman
504 7th Street, SE
Washington, DC 20003

Nina Kraut
3815 Yuma Street, NW
Washington, DC 20016

Diane S. Lepley
505 Second Street, NW
Washington, DC 20001

Arthur M. Levin
301 Eye Street
Washington, DC 20001

Cynthia Lobo
419 7th Street, NW; Suite 410
Washington, DC

Leonard Long
1010 Vermont Avenue, NW, Suite 618
Washington, DC 20005

James L. Lyons
Kellogg, Williams & Lyons
1275 K Street, NW; Suite 825
Washington, DC 20005

Thomas B. Mason
Public Defender Service
451 Indiana Avenue, N.W.
Washington, DC 20001

Ernest W. McIntosh, Jr.
Eaton, McClellan & Allen
1333 H Street, NW
West Tower—3rd Floor
Washington, DC 20005

William H. Murphy, Jr.
1007 North Calvert Street
Baltimore, MD 21202

Leroy Nesbitt
301 I Street, NW
Washington, DC 20001

G. Goodwin Oyewole
601 Pennsylvania Avenue, NW
9th Floor
Washington, DC 20004

Retna Mae Pullings
601 Indiana Avenue, NW, Suite 900
Washington, DC 20004

Michelle A. Roberts
Perazich & Wynn
1201 Connecticut Avenue, NW, Suite 750
Washington, DC 20036

James Robertson (associated with Howard Univ. Law
School)
2900 Van Ness Street, NW
Washington, DC 20008

Sol Rosen
301 Eye Street, NW
Washington, DC 20001

Robert Sanders
601 Indiana Avenue, NW, Suite 603
Washington, DC 20004

Thomas Slawson
918 F Street, NW, Suite 210
Washington, DC 20004

Alan Soschin
307 G Street, NW
Washington, DC 20001

Joseph Virgilio
1730 K Street, NW, Suite 304
Washington, DC 20006

Robert M. Werdig, Jr.
715 8th Street, SE, Suite 1
Washington, DC 20003

Yes ___ No ___
If "yes," please specify: _____
_____
_____
_____

27(a) Please rank the following in the order upon which you rely upon them as your main source of news ("1" being the most and "5" being the least)?
___ TV ___ magazines
___ radio ___ conversations with
 friends
___ newspapers

(b) What newspapers do you regularly read? _____
_____

(c) What magazines do you regularly read? _____

(d) What television programs do you regularly watch? _____
_____
_____

(e) What radio stations do you listen to regularly? _____
_____

(f) How many days during the week do you read a daily newspaper?
_____

(g) What is the average number of hours that you read a newspaper each day?
_____

(h) What is the average number of hours that you watch television each day?
_____

(i) What is the average number of hours that you listen to the radio each day?
_____

(j) Have you read or heard through the newspaper, television, the radio or otherwise anything about the trial of Rayful Edmond, III and others in this Court?
 Yes ___ No ___
If "yes," please describe what you recall having read or heard.
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

If you have read or heard about the trial of Rayful Edmond, III and others in this Court, would you be able to put aside what you have read or heard and render a fair and impartial verdict in this case based solely upon the evidence you see and hear during the trial of this case?
 Yes ___ No ___

28) Do you belong to any club or organization that takes a position, pro or con, on the use of drugs or guns?
 Yes ___ No ___
If "yes," please explain without giving the name of the club or organization:
_____
_____
_____
_____

29) Please describe any hobbies or recreational activities in which you participate.

30) The following is a list of names of individuals who may be mentioned in the course of the trial. If you personally, or any member of your immediate family, know or have any connection (personal, business, or social) with any of these individuals, or have heard of any of them, circle the number in front of the name of that person:

1. BROOKS, Royal S., Jr.
2. BUTLER, Melvin D.
3. CAIN, Gregory
4. CHAMBERS, Curtis B., also known as "Kirkbone"
5. COOPER, Keith E., also known as "Cheese"
6. CHILDRESS, Willie
7. CURRY, Ronald
8. DANIELS, Columbus, also known as "Little Nut"
9. EDMOND, Rachelle
10. EDMOND, Rayful, III
11. GREEN, Ronald, also known as "Ronnie Green" and "Ronnie Jackson"
12. HARDY, Robert M., also known as "Fila Rob"
13. JESSIE, Anthony L., also known as "Anthony Hill"
14. JOHNSON, Denise
15. JOHNSON, Troy
16. JONES, James Antonio, also known as "Tonio"
17. LEWIS, Tony
18. LINDSAY, Deatria C.
19. MATHIS, James C.
20. MCCRAW, Bernice H., also known as "Nicey"
21. MCCRAW, David M.
22. MCDONALD, Patrick
23. MILLINGTON, Jerry R.
24. MINOR, James
25. MONFORD, John
26. MORGAN, Ronald
27. PERRY, Armaretta B.
28. PERRY, Constance D., also known as "Bootsie"
29. SELLERS, Kathy
30. STEWART, Melvin E., also known as "Melbo"
31. SULLIVAN, Harry, Jr., also known as "Whitey"
32. SUTTON, Emanuel W., also known as "Mangie"
33. TERRELL, Brandon
34. THOMPSON, Jeffrey L.
35. THOMPSON, Raynice
36. WADE, Katrina
37. WHEELER, Leslie, also known as "June"
39. WHITE, Steven J.
40. WILSON, Linda
41. ZANVILLE, Alta Rae
42. ZANVILLE, Myron

If you have circled any of the numbers preceding the above names, please briefly explain how you, or a member of your family, know, are connected with, or heard of the individual(s) whose name(s) you circled:

_____
_____
_____
_____
_____
_____

31) The law is that jurors are to make determinations of fact and are to act as judges of the facts based on what they see and hear presented in the course of a trial, and that they are not to be influenced by anything that they see or hear outside the courtroom or by the nature of the offenses with which a defendant is charged in reaching a verdict. Would you have any difficulty with accepting this proposition of law?
Yes ___ No ___
If "yes," please explain: _____
_____

32) The jury will be instructed not to read, watch, or listen to any news accounts of the trial until it is over, and not to talk to anyone about the case, not even to the other jurors, until the jury retires to deliberate upon its verdict. Would you have any difficulty with accepting this proposition of law?
Yes ___ No ___
If "yes," please explain:
_____

33) The jury will be instructed that the defendants charged in this case are presumed to be innocent throughout the trial, and that no defendant can be found guilty of any offense until the Government has proved each element of that offense beyond a reasonable doubt. Would you have any difficulty with accepting this proposition of law?
Yes ___ No ___
If "yes," please explain:
_____

34) Under our laws, each defendant has the right to decide whether he or she will testify. If a defendant elects not to testify, the law is that a jury may not draw an inference of guilt against a defendant because of his or her decision not to testify. Would you have any difficulty with accepting this proposition of law?
Yes ___ No ___
If "yes," please briefly explain: ___
_____

35) I request an opportunity to discuss privately with the Court and counsel my answer(s) to or my failure to answer question(s) _____

for the following reason(s) (First list the question number, and then give your reason on the space provide below):

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

PLEASE TURN TO NEXT PAGE.

I hereby declare under the pain and penalty of perjury that the foregoing responses are true and correct to the best of my knowledge, information, and belief.

_____
(Juror's signature)

_____
Date and Time